[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 2, 2007
THOMAS K. KAHN
CLERK

No. 05-16010

_____

D. C. Docket No. 01-01430-CV-MHT-CSC

TONY LEE SMITH,

                                                Plaintiff-Appellant,

versus

RICHARD F. ALLEN, et al.,

                                                Defendants,

STEVE WALKER, Chaplain,
WILLIE WHITING, Chaplain,
BILL LINDSEY, Chaplain,
ANTHONY ASKEW, Chaplain,
DONAL CAMPBELL, Commissioner,
ALBERT MURRAY, Deputy Commissioner,

                                                Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Alabama

_____

(October 2, 2007)

Before EDMONDSON, Chief Judge, and BIRCH and WILSON, Circuit Judges.

BIRCH, Circuit Judge:

Plaintiff-Appellant Tony Lee Smith, a prison inmate, brought this action against a number of members of the Religious Activities Review Committee of the Alabama Department of Corrections ("ADOC"), contending that these members had violated his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1 through § 2000cc-5, as well as his constitutional rights, by declining him permission to possess certain items in connection with his practice of Odinism. Smith sought injunctive relief and monetary damages. The district court granted summary judgment in favor of the defendant-appellees, and Smith now appeals. For the reasons set forth in this opinion, we AFFIRM the judgment of the district court.

## I. BACKGROUND

Smith is presently an inmate at the Kilby Correctional Facility in Mt. Meigs, Alabama. At the time this action was commenced, Smith was an inmate at the Limestone Correctional Facility in Capshaw, Alabama. Smith is a practitioner of Odinism, an ancient pre-Christian faith also known as Asatru.[1] Odinism's theology

---

[1] For a thorough and helpful discussion of the tenets of Odinism / Asatru, see Rust v. Clarke, 883 F. Supp. 1293, 1297-98 (D. Neb. 1995) and Borzych v. Frank, 340 F. Supp. 2d 955, 960 (W.D. Wis. 2004) (discussing additional aspects of Odinism). See also Odinic Rite, Questions and Answers About the OR and Odinism, http://www.odinic-rite.org/qa.htm **(last**

is grounded in ancient Icelandic sagas and runic mysticism. Adherents to the religion strive to attain the "Nine Noble Virtues," which are described as courage, truth, honor, fidelity, discipline, hospitality, industriousness, self-reliance, and perseverance. To attain these virtues, members of the Odinist faith must communicate with the ancient Norse gods and goddesses–by studying runes, practicing rites on specified days of the week, and observing the major Odinist holidays. See R1-8, Exh. B4; Rust, 883 F. Supp. at 1298.

During his incarceration, Smith submitted a series of requests to the Religious Review Committee of the ADOC, seeking approval of certain practices in connection with his practice of Odinism. In February 2001, Smith first requested permission to light a small fire; permission to observe the Odinist rites on specified days of the week; and permission for a designated area at the prison site for him to conduct his worship. The ADOC granted Smith's request to practice his Odinist religion and to receive Odinist literature, but denied his request to have a designated area for worship, based on its concern that doing so would pose security concerns and "could easily result in violence against other inmates and staff," and the assertion that "[t]his religion also promotes racial superiority and is a popular front for hate groups." R1-8, Exh. D; see also id. Exh. C. Shortly

**visited Aug. 1, 2007).**

3

thereafter, in November 2001, Smith filed this lawsuit, alleging violations of RLUIPA, the First Amendment, and the Equal Protection Clause.

While Smith's lawsuit was pending, in June 2003 Smith submitted a supplemental request to the ADOC Religious Activities Review Committee, this time requesting the following: one small quartz crystal; one religious necklace in the shape of "Thor's hammer," R2-63, Exh. K-1 at 3; permission from the ADOC to light a pine wood fire in a "small fire pit, approximately 9" in diameter and 9" deep," id. at 2; permission to observe Thursday ("Thor's Day") as a designated day of worship, id.; and a formal recognition of Odinism by the ADOC. Id. at 1. Smith was advised by a Chaplain with the ADOC that the Chaplain would personally review the request; the Chaplain later stated that, in a discussion with Smith, he had told him that

> after [Smith's] filing the request, with authoritative sources, validating the requests, [the request] would be reviewed by me and then [the Warden], who were different reviewers at the institutional level . . . Inmate Smith's requests would then be sent to the Religious Activities Review Committee with the scholarly, authoritative sources validating his claims for these requests. I stressed the importance of identifiable[,] authoritative sources, which scholars and/or his specific faith community collectively recognize.

Id., Exh. K at 3.

4

In connection with Smith's pending request, Smith had a friend who was outside of the prison system submit additional sources on Odinism–via mail–to the ADOC Chaplain. The Chaplain, however, advised Smith that he found that the sources "may be okay, but that they were incomplete and sketchy since they did not give information on the basic [tenets] of the religion itself or reference further sources that could be accessed by me." Id. at 4. Consequently, the Chaplain sought to "gather more informative sources on [his] own," including having discussions with a Chaplain in a prison in Nebraska[2] about the doctrinal underpinnings of Odinism, and locating additional background sources on the religion. Id. After the Chaplain had "gather[ed] information" and "research[ed] the [credibility]" of Smith's requests, he submitted Smith's case to the ADOC Religious Activities Review Committee ("the Committee") for a final decision. Id.

After conducting a meeting to discuss Smith's request, the Committee rendered a decision in October 2003. The Committee's decision was as follows. First, the Committee granted Smith's request for a religious necklace in the shape of Thor's hammer. The Committee also granted Smith's request to use a ceremonial fire in connection with his practice of Odinism, albeit "in the form of a candle in a private secure place." R2-98, Exh. M at 2. The Committee granted

---

[2] Apparently, Nebraska's prison system houses a large number of Odinists. See generally Rust, 883 F. Supp. 1293.

5

Smith's request to have a special day of the week–Thursday / Thor's Day–to practice the Odinist rites. It also granted Smith's requests to recognize a total of four Odinist holidays; to possess runes to use in connection with his religious study; and to use and possess a small, fern tree twig "in a manner that would not jeopardize security." Id. With respect to Smith's request to have Odinism recognized by the ADOC, the Committee stated that the request was granted, insofar as the ADOC agreed to formally recognize Smith's right to independently practice Odinism, including his right to have "literature, space, and [] approved paraphernalia." Id. at 1.

The Committee declined the following aspects of Smith's request. First, it declined Smith's request to possess a small crystal, due to a "lack of supporting materials validating a need for this item." Id. Second, the Committee denied Smith's request for a "designated place of worship" to perform the Odinist rites. Id. at 2. With respect to this issue, the Committee expressed concern that Odinism's alleged connections with Neo-Nazism and white supremacist beliefs would pose security problems in the prison, were Odinism to be granted a designated area of worship in the open, common area of the prison. The Committee, however, advised Smith that he would be granted a secure location to practice his Odinist rites, stating: "[w]hen a secure place of worship is required,

6

the Warden and the Chaplain may designate a suitable location for Smith to conduct his rites." Id. Finally, the Committee declined Smith's request for a fire pit, limiting him instead to a small candle.

Smith was released from imprisonment in January 2004. The ADOC defendant-appellees subsequently moved for summary judgment in connection with Smith's pending lawsuit.[3] After reviewing the parties' arguments, the magistrate judge made the following recommendations.

First, the magistrate judge found that the ADOC had already granted a number of Smith's requests, including his request for a worship spot; for a Thor's hammer necklace; for a small fire; and for a formal recognition of Odinism as a valid religion. Accordingly, the magistrate judge determined that these claims had all been rendered moot. He found that the only claim still pending before the court was Smith's RLUIPA claim based upon the denial of his request for a small quartz crystal. As to that remaining claim, the magistrate judge found that Smith had

---

[3] The defendant-appellees filed a number of "Special Reports" addressing Smith's arguments and his claims for relief. The magistrate judge subsequently chose to collectively construe these "Special Reports" as a motion for summary judgment. The propriety of that decision is not before us on appeal, and therefore, we do not address it. See AT&T Broadband v. Tech Commc'ns Inc., 381 F.3d 1309, 1320 n.14 (11th Cir. 2004) ("Issues not raised on appeal are considered abandoned.") (citation omitted). Rather, for purposes of this appeal, we will assume that the magistrate judge acted properly in construing the "Special Reports"–and the responses thereto–as motions for summary judgment.

been released from prison, thereby mooting the injunctive relief aspects of that claim.[4]

As to Smith's claim for monetary damages under RLUIPA–based only on the denial of the requested crystal–the magistrate judge found that Smith had lodged claims against the defendant-appellees in both their official and individual capacities. With respect to Smith's official capacity suit, however, the magistrate judge stated that a suit against the defendant-appellees in their official capacities for money damages would not lie, because "the proper defendant in the official action claims is the governmental entity." R3-146 at 9. Accordingly, to the extent Smith's action involved any official capacity claims against the defendant-appellees, the magistrate judge recommended that they be granted summary judgment.

With respect to Smith's claim against the defendant-appellees in their individual capacities–based, again, solely on the denial of the crystal–the magistrate judge found that Smith had established a prima facie RLUIPA claim. Specifically, the magistrate judge found that Smith had demonstrated that "ADOC's curtailment of his use of a crystal during religious ceremonies substantially burdened the exercise of his religion." Id. at 20. Nor, the magistrate

---

[4] See, e.g., Zatler v. Wainwright, 802 F.2d 397, 399 (11th Cir. 1985) (per curiam) (stating that a transfer or release from prison will moot the prisoner's claims for injunctive relief).

judge found, had the ADOC defendant-appellees established that the denial of Smith's possession of a crystal was necessary to further a compelling governmental interest and was the least restrictive means of achieving that interest. Accordingly, the magistrate judge recommended denying summary judgment in favor of the defendant-appellees on Smith's RLUIPA claim for money damages. The magistrate judge declined to entertain a defense of qualified immunity for the defendant-appellees on Smith's RLUIPA claim, due to his determination that the law was "clearly established" when the ADOC defendant-appellees had first received Smith's request for a crystal, and, therefore, qualified immunity would not apply. R3-151 at 4.

In December 2005 the district court reviewed the recommendations of the magistrate judge. The district court agreed with the magistrate judge that a number of Smith's claims had been rendered moot by the ADOC's decision to grant his requests in 2003, and that Smith's only surviving RLUIPA claim was based upon the ADOC's denial of a small quartz crystal. The court further agreed that the injunctive aspect of this remaining claim had been rendered moot by Smith's release from prison in 2004. Thus, the court only addressed Smith's claim for monetary damages based on the denial of the crystal.

Turning to that claim, the district court first found that no action would lie against the defendant-appellees in their official capacities, because such a claim was "barred by the Eleventh Amendment." Smith v. Haley, 401 F. Supp. 2d 1240, 1244 (N.D. Al. 2005). As to the claim against the defendant-appellees in their individual capacities for damages, the district court first expressed skepticism as to whether individual capacity claims for monetary damages were available under RLUIPA. Moreover, even assuming that such a claim were viable, and that the denial of a crystal constituted a "substantial burden on the religious exercise of a person" so as to constitute a RLUIPA violation under 42 U.S.C. § 2000cc-1, the district court concluded that the defendant-appellees would be entitled to qualified immunity on Smith's individual capacity claims, because, contrary to the magistrate judge's finding, "Smith's right to possess a crystal as part of his practice of Odinism was not clearly established." Id. at 1250. Since the district court found that the defendant-appellees were entitled to qualified immunity on Smith's individual capacity claims under RLUIPA, it granted summary judgment in favor of the defendant-appellees.[5] This appeal followed.

---

[5] The district court also granted summary judgment in favor of the defendant-appellees on Smith's Equal Protection Claim. See Smith, 401 F. Supp. 2d at 1244. The dismissal of the Equal Protection claim has not been appealed by Smith, see Br. of Appellant at 34, and, accordingly, we do not address it. See AT&T, 381 F.3d at 1320 n.14.

The district court also granted summary judgment in favor of the defendant-appellees on Smith's First Amendment claim brought under 42 U.S.C. § 1983. On appeal, Smith requests that we address the merits of his First Amendment claim if we affirm the dismissal of his RLUIPA

10

## II. DISCUSSION

On appeal, Smith contends that summary judgment should not have been granted in favor of the defendant-appellees for a number of reasons. First, Smith argues that the district court erred in treating his request for injunctive relief–based on the denial of his crystal–as moot, in light of his release from prison in 2004. Smith asserts that because he was re-incarcerated after the district court entered its summary judgment order, and because he is still subject to the ADOC's 2003 decision preventing him from possessing a crystal, his claim for injunctive relief based on the denial of a crystal is not moot, and should be considered on its merits. Second, he argues that the district court erred in finding that other aspects of his claim–namely, his request for a designated worship area and his request that he be allowed to light a small pine fire in a 9" by 9" fire pit–had been mooted by the ADOC's 2003 decision. Third, Smith contends that he is entitled to monetary damages against the defendant-appellees (in both their official and their individual capacities) based on their alleged violations of RLUIPA, and that, contrary to the district court's conclusion, the defendant-appellees are not shielded in their

claim. If a prison's regulation passes muster under RLUIPA, however, it will perforce satisfy the requirements of the First Amendment, since RLUIPA offers greater protection to religious exercise than the First Amendment offers. See Charles v. Frank, 101 Fed. App'x 634, 635 (7th Cir. 2004) (per curiam). Since, as explained below, we conclude that Smith failed to present sufficient evidence to withstand summary judgment on his RLUIPA claim, it follows that summary judgment was also appropriate on his First Amendment claim under § 1983. We need not address that aspect of the district court's decision.

11

individual capacities from monetary liability under the doctrine of qualified immunity. Smith further asserts that because he presented sufficient evidence to establish a prima facie violation of RLUIPA by the defendant-appellees, and because the defendant-appellees failed to demonstrate that the substantial burdens on his practice of Odinism were necessary to further a compelling governmental interest, he is entitled to both injunctive relief and monetary damages under RLUIPA.

A. Standard of Review

We review a district court's grant of summary judgment de novo, applying the same legal standard used by the district court. See Johnson v. Bd. of Regents, 263 F.3d 1234, 1242 (11th Cir. 2001) (citation omitted). We draw all factual inferences in a light most favorable to the non-moving party–in this case, Smith. Id. at 1243 (citation omitted). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We have stated that "the plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Johnson, 263 F.3d at 1243 (quotations and citation omitted).

12

"Additionally, we note that we may affirm the district court's decision on any adequate ground, even if it is other than the one on which the court actually relied." Parks v. City of Warner Robins, 43 F.3d 609, 613 (11th Cir. 1995) (citation omitted).

Our discussion of Smith's appeal requires that we unravel a number of separate legal issues. First, we review RLUIPA's legislative history and the standard of liability that the statute sets forth. We then turn to Smith's claims for injunctive relief under RLUIPA, and whether the district court erred in concluding that those claims for injunctive relief were moot. Third, we address the question of what additional relief, if any, is available under RLUIPA–specifically, whether the phrase "appropriate relief" in RLUIPA's remedies section, 42 U.S.C. § 2000cc-2(a), contemplates money damages. We then address whether an entitlement to monetary damages for violations of RLUIPA includes the right to seek *individual* liability against defendants under RLUIPA, and, if so, whether the qualified immunity defense would apply to those actions. Having resolved those legal questions, we then assess the merits of Smith's RLUIPA claims against the defendant-appellees.

B. Background on RLUIPA

"RLUIPA is the latest of long-running congressional efforts to accord religious exercise heightened protection from government-imposed burdens." Cutter v. Wilkinson, 544 U.S. 709, 714, 125 S. Ct. 2113, 2117 (2005). The statute's origins stem from the Supreme Court's decisions in two cases, Employment Division, Department of Human Resources of Oregon v. Smith, 494 U.S. 872, 110 S. Ct. 1595 (1990) and City of Boerne v. Flores, 521 U.S. 507, 117 S. Ct. 2157 (1997). Prior to Smith, the Supreme Court had employed a compelling interest standard for testing the constitutional validity of laws of general applicability that affected religious practices; government actions that burdened religious practices had to be justified by a compelling government interest. See Sherbert v. Verner, 374 U.S. 398, 402-03, 83 S. Ct. 1790, 1792-94 (1963); Atkins v. Kaspar, 393 F.3d 559, 566 (5th Cir. 2004) (discussing the pre-Smith landscape). In Smith, however, the Supreme Court held that laws of general applicability that only incidentally burden religious conduct do not offend the Free Exercise Clause of the First Amendment. Smith, 494 U.S. at 878-79, 110 S. Ct. at 1599-1600.

Congress responded to Smith by passing the Religious Freedom and Restoration Act of 1993 ("RFRA"), in which it sought to reinstate the pre-Smith "compelling interest" standard for laws of general applicability burdening a person's religious practices. See Cutter, 544 U.S. at 714-15, 125 at 2118. RFRA

14

had "universal" coverage, applying to all state and federal laws, and purportedly was passed pursuant to Congress' enforcement powers under section 5 of the Fourteenth Amendment. See City of Boerne, 521 U.S. at 516-17, 117 S. Ct. at 2162; see also Cutter, 544 U.S. at 715, 125 S. Ct. at 2118 (stating that RFRA lacked a Commerce Clause or Spending Clause underpinning). In City of Boerne, however, the Supreme Court invalidated RFRA as applied to the states, holding that the statute exceeded Congress' remedial powers under the Fourteenth Amendment. 521 U.S. at 535-36, 117 S. Ct. at 2172.

Congress again responded, this time by enacting RLUIPA, 42 U.S.C. § 2000cc-2000cc-5. "Less sweeping than RFRA," and "invoking federal authority under the Spending and Commerce Clauses," Cutter, 544 U.S. at 715, 125 S. Ct. at 2118, RLUIPA targets only two narrow areas for protection: land use (section 2 of the Act, 42 U.S.C. § 2000cc) and the religious exercise of institutionalized persons (section 3 of the Act, 42 U.S.C. § 2000cc-1).

The latter section, which is at issue in the present appeal, states that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability," unless the government can demonstrate that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive

15

means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). Section 3 of RLUIPA thereby affords to prison inmates a "heightened protection from government-imposed burdens," by requiring that the government demonstrate that the substantial burden on the prisoner's religious exercise is justified by a compelling, rather than merely a legitimate, governmental interest. See Warsoldier v. Woodford, 418 F.3d 989, 994 (9th Cir. 2005) (citation omitted). In doing so, section 3 affords confined persons "greater protection of religious exercise than what the Constitution itself affords." Lovelace v. Lee, 472 F.3d 174, 186 (4th Cir. 2006). Section 3 applies whenever "the substantial burden on religious exercise is imposed in a program or activity that receives federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1).

C. Smith's Claims for Injunctive Relief Under RLUIPA

On appeal, Smith first argues that the district court erred in construing his claims for injunctive relief under RLUIPA as being moot. Smith's argument in this regard is two-fold. First, he contends that the district court erred in treating his request for injunctive relief based on his request for a small quartz crystal as moot, due to his release from prison in 2004. Second, he argues that the district court erred in assuming that his other requests for injunctive relief–namely, his petition

16

for a designated worship area and his request for a fire pit–had been mooted by the ADOC Committee's 2003 decision. We address each argument in turn.

"Article III of the Constitution limits the jurisdiction of the federal courts to the consideration of 'Cases' and 'Controversies.'" Mingkid v. U.S. Att'y Gen., 468 F.3d 763, 768 (11th Cir. 2006) (citation omitted). "The doctrine of mootness derives directly from the case-or-controversy limitation, because an action that is moot cannot be characterized as an active case or controversy." Id. (citation omitted). Accordingly, we may not entertain an appeal unless there is a present case or controversy, that is, "an actual dispute [that] continues to exist between the parties." Bourgeois v. Peters, 387 F.3d 1303, 1308 (11th Cir. 2004). On the other hand, "[a] case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief." Mingkid, 468 F.3d at 768 (citation, alteration, and internal quotations omitted).

The general rule in our circuit is that a transfer or a release of a prisoner from prison will moot that prisoner's claims for injunctive and declaratory relief. McKinnon, 745 F.2d at 1363; Zatler v. Wainright, 802 F.2d 397, 399 (11th Cir. 1986) (per curiam).[6] The reason for this rule is that injunctive relief is "a

_____

[6] A release from prison does not moot a claim for monetary damages, McKinnon, 387 F.3d at 1362, since a claim for monetary damages "looks back in time and is intended to redress a past injury." Adler v. Duval County Sch. Bd., 112 F.3d 1475, 1477 (11th Cir. 1997).

17

prospective remedy, intended to prevent future injuries," Adler, 112 F.3d at 1477, and, as a result, once the prisoner has been released, the court lacks the ability to grant injunctive relief and correct the conditions of which the prisoner complained. See, e.g., Wahl v. McIver, 773 F.2d 1169, 1173 (11th Cir. 1985) (per curiam) (stating that a prisoner's past exposure to sub-par conditions in a prison "does not constitute a present case or controversy involving injunctive relief").

The district court relied on this well-established rule, and concluded that Smith's claim for injunctive relief–requesting that the ADOC be ordered to grant him a crystal for his practice of Odinism–had been rendered moot by his release from prison in 2004. The court found that "[Smith's] release constituted a change in the facts that ended the controversy with respect to injunctive relief for this alleged injury," that is, the denial of the crystal. Smith, 401 F. Supp. 2d at 1244. This determination was not erroneous at the time it was made–indeed, under the law of our circuit, Smith's release from the prison would have mooted his claim for injunctive relief requesting that he be granted the *future* use of a crystal.

In an interesting turn of events, however, after the district court rendered its decision and granted summary judgment in favor of the defendant-appellees on Smith's claim for injunctive relief, Smith was re-incarcerated. At present, Smith remains incarcerated in the ADOC prison system. Moreover, as the defendant-

appellees concede, Smith is again subject to the ADOC's 2003 decision denying his request for a small, quartz crystal. Smith's appellate brief includes a letter from the ADOC, dated 14 September 2006, which indicates that the 2003 Committee decision remains in full effect and is applicable to his earlier religious requests. See Reply Br. of Appellant, Exh. 1. Thus, if Smith were to again request the use of a small quartz crystal in connection with his practice of Odinism, the ADOC would presumably decline his request for the same reasons it did in its original 2003 decision, namely, that there was a "lack of supporting materials validating a need for this item." R2-98, Exh. M at 1.

In light of this evidence, we conclude that Smith's claim for injunctive relief, predicated on the prospective use of a quartz crystal, is not moot. The fundamental question with respect to mootness is whether events have occurred subsequent to the filing of an appeal that "deprive the court of the ability to give the . . . appellant meaningful review." Al Najar v. Ashcroft, 273 F.3d 1330, 1336 (11th Cir. 2001) (per curiam). Here, were we to conclude that the denial of a quartz crystal constituted a substantial burden on Smith's religious practice and that it was not justified by a compelling government interest, we would have the ability to afford relief to Smith, by reversing the district court's summary judgement order and remanding the case so that Smith could obtain the injunctive

19

relief he seeks. Because we have the ability to effectuate a remedy in Smith's case, we conclude that this particular aspect of his case is not moot.[7] See, e.g., SunAmerica Corp. v. Sun Life Assurance Co. of Canada, 77 F.3d 1325, 1333 (11th Cir. 1996) (stating that "[t]he ability of the appellate court to effectuate a partial remedy is sufficient to prevent mootness" and concluding that because "potential relief remains available to [the plaintiff] . . . th[e] case is not moot and [] we have jurisdiction to decide the merits of this appeal") (quotations and internal citations omitted). Therefore, in assessing the merits of Smith's RLUIPA action, we will consider Smith's claim for injunctive relief, based on his request for a small, quartz crystal.

Smith further challenges the district court's determination that other aspects of his claim for injunctive relief had been mooted by the ADOC Religious Activities Review Committee's decision in 2003. Specifically, he challenges the district court's conclusion (based on the magistrate judge's recommendation) that

---

[7] Nor, despite the parties' arguments, need we inquire into whether Smith's case would fall under the "capable of repetition yet evading review" exception to mootness. See Murphy v. Hunt, 455 U.S. 478, 482, 102 S. Ct. 1181, 1183 (1982) (per curiam) (discussing this exception to mootness).

In this case, it is not a question of whether the denial of Smith's crystal is reasonably likely to occur in the future, such that this exception would apply. See id. Rather, the conduct at issue is occurring at present, since Smith remains subject to the 2003 denial of his crystal. Because this is a live case or controversy, one to which we have the ability to presently afford meaningful relief, Smith's claim based on the denial of the crystal is not moot in the first place. An inquiry into whether an *exception* to mootness applies–such as whether the conduct is likely to recur in the future–would thus be misplaced and unnecessary.

20

his requests for a "designated place of worship" and for a pine wood fire in a "small fire pit approximately 9" in diameter and 9" deep," R2-63, Exh. K-1 at 1-2, had been mooted–prior to the summary judgment stage–by the Committee's 2003 decision.

In assessing these claims, the district court adopted the magistrate judge's finding that Smith's request for a designated place of worship had been mooted, since the Committee had decided that Smith would be granted "a secure place of worship" going forward. R2-98, Exh. M at 2. Notably, the Committee declined to grant Smith's request for a "*designated place of worship* to perform [the Odinist] rites" within the larger prison area, id. (emphasis added); however, the district court construed the Committee's decision to grant Smith a "secure place of worship," id., as, effectively, a grant of his request, thereby rendering it moot. The district court also concluded that the Committee decision granting Smith "a candle [to be used] in a private secure place," id., had effectively satisfied Smith's request for a ceremonial fire pit, and, therefore, that particular claim for injunctive relief had been mooted.

Smith contends that these conclusions were in error, and that, contrary to the district court's finding, the 2003 decision did not moot these two individual requests for injunctive relief. He points out that his request for a designated place

21

of worship was actually *denied* by the Committee, and that this request for injunctive relief remains pending at present, since he continues to petition the ADOC for a designated worship area in the prison. In other words, Smith argues that the Committee's limiting of his request to a "secure place of worship," R2-98, Exh. M at 2, does not moot his (still extant) request for "a designated area of worship" in the greater prison, R2-63, Exh. K-1 at 1, and that therefore, we may consider it. Additionally, Smith contends that the Committee's granting him a small candle did not moot his claim for "a fire pit, approximately 9" in diameter and 9" deep," id. at 2, and, since this claim for injunctive relief remains pending, we may consider that request as well.

We agree. As noted earlier, Smith is presently incarcerated, is subject to the ADOC's earlier decision, and is apparently continuing to press his request for a designated place of worship in the general prison area and for a ceremonial fire pit. As discussed, injunctive relief is prospective in nature, "intended to prevent future injuries," including the ADOC's continued denial of a designated worship spot and a 9" by 9" fire pit. See Adler, 112 F.3d at 1477. While the district court found that these two claims were no longer pending, because the Committee had "allow[ed] Smith to possess certain religious objects, as well as an area in which to practice his faith," Smith, 401 F. Supp 2d at 1244, we agree that the Committee's

22

decision–which was partial in nature–did not wholly nullify Smith's requests, and that, for purposes of mootness, we retain the ability to effectuate a partial remedy in this case. See SunAmerica, 77 F.3d at 1333 ("The ability of the appellate court to effectuate a partial remedy is sufficient to prevent mootness.") (citation and internal quotations omitted).

Put simply, were we to find that the denial of a designated worship place in the larger prison, and the denial of a 9" by 9" fire pit, did in fact violate RLUIPA, Smith could obtain to "appropriate relief," 42 U.S.C. § 2000cc-2(a), including, in the court's discretion, an injunction prospectively granting him these two requests, in their entirety. Because some "potential relief remains available to [Smith]," we hold that these two claims are "not moot and that we have jurisdiction to decide the merits" of these claims. See SunAmerica, 77 F.3d at 1333. We agree that the district court should not have labeled these two particular claims for injunctive relief as being moot, based solely on the Committee's 2003 decision, which only partially granted Smith's requests. As a result, we consider these two claims on the merits in addressing Smith's underlying RLUIPA action.

D. Viability of Smith's Claims for Monetary Damages Under RLUIPA

Having resolved which claims for injunctive relief remain viable in Smith's appeal, we now must address whether Smith could obtain additional, monetary

23

relief in the event he were to establish a RLUIPA violation. This inquiry involves the preliminary question of whether monetary damages are provided for under RLUIPA's statutory rubric, and, if so, whether Smith may allege either an individual or an official capacity suit for damages–or both–under RLUIPA.

1. Availability of Monetary Damages Under RLUIPA

RLUIPA creates a private cause of action for a prison inmate if section 3 is violated, and further provides that the complaining party, if successful, may "obtain appropriate relief against a government." 42 U.S.C. §2000cc-2(a). While the parties do not dispute that the phrase "appropriate relief" would presumably entitle a complaining inmate to injunctive and declaratory relief–such as, for example, an order granting the inmate the right to a particular object for use in religious worship–the question is whether that phrase also encompasses a right to monetary relief.

To put it mildly, "there is a division of authority" on this question. Madison v. Va., 474 F.3d 118, 130 n.3 (4th Cir. 2006). Some district courts have concluded that the phrase "appropriate relief" as used in RLUIPA does not encompass monetary damages. See, e.g., Boles v. Neet, 402 F. Supp. 2d 1237, 1241 (D. Co. 2005) ("It would appear, therefore, that the 'appropriate relief' permitted under the statute must be limited to injunctive or declaratory relief . . . ."); see also Daker v.

24

Ferrero, 475 F. Supp. 2d 1325, 1337 (N.D. Ga. 2007) (finding RLUIPA to be "ambiguous on the question of whether it authorizes a private right of action seeking monetary damages," but rejecting a recovery of monetary damages, inasmuch as they are sought in an individual capacity lawsuit). A number of district courts have concluded otherwise, and have found that RLUIPA's phrase, "appropriate relief," is sufficiently broad to include some forms of monetary relief. See Shidler v. Moore, 409 F. Supp. 2d 1060, 1067 (N.D. Ill. 2006); Guru Nanak Sikh Soc. of Yuba City v. County of Sutter, 326 F. Supp. 2d 1140, 1161-62 (E.D. Cal. 2003); see also Chase v. City of Portsmouth, No. 2:05CV446, 2005 WL 3079065, at *5 (E.D. Va. Nov. 16, 2005) ("Appropriate relief may include injunctive and declaratory relief as well as nominal damages.") (citation omitted). Still other courts have assumed that money damages are available, without actually deciding the question. See Presley v. Edwards, No. 2:04-CV -729-WKW, 2007 WL 174153, at *13 (M.D. Al. Jan. 19, 2007); Gooden v. Crain, 405 F. Supp. 2d 714, 723-24 (E. D. Tex. 2005); Charles v. Verhagen, 220 F. Supp. 2d 937, 938-39 (W.D. Wis. 2002). This was the approach taken by the district court in this case in disposing of Smith's action. See Smith, 401 F. Supp. 2d at 1246.

The Supreme Court has instructed that, where Congress had not given any guidance or clear indication of its purpose with respect to remedies, federal courts

25

should presume the availability of all appropriate remedies. See Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 68-69, 112 S. Ct. 1028, 1034 (1992) (citations omitted). In Franklin, the issue before the Court was what types of remedies were available in a private right of action for sex discrimination under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Although the statute was silent as to what remedies were available, the court stated that it was appropriate for a court to "presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise." 503 U.S. at 66, 112 S. Ct. at 1032. Thus, absent any intent to the contrary reflected in the statute, the Court instructed that the presumption should be in favor of all available relief–both injunctive and monetary. Id. at 73, 112 S. Ct. at 1036.

After Franklin, courts–when faced with a statute lacking express guidance on the question of remedies–have generally adhered to this presumption. In Reich v. Cambridgeport Air Systems, Inc., for example, the First Circuit concluded that the general phrase "all appropriate relief," as used in section 11(c) of the Occupational Safety and Health Act, 66 U.S.C. § 660(c), "embrace[d] monetary damages as well as other relevant forms of relief normally available." 26 F.3d 1187, 1191 (1st Cir. 1994).

26

In light of Franklin and its progeny, we agree that the use of the phrase "appropriate relief" in section 3 of RLUIPA, 42 U.S.C. § 2000cc(a), is broad enough to encompass the right to monetary damages in the event a plaintiff establishes a violation of the statute. Congress expressed no intent to the contrary within RLUIPA, even though it could have, by, for example, explicitly limiting the remedies set forth in § 2000cc(a) to injunctive relief only. Instead, Congress used broad, general language in crafting the remedies section of RLUIPA, stating that a prevailing party could obtain "appropriate relief." 42 U.S.C. § 2000cc(a). We assume that, when Congress acted, it was aware of Franklin's presumption in favor of making all appropriate remedies available to the prevailing party. See Franklin, 503 U.S. at 73, 112 S. Ct. at 1036. In light of that presumption, we conclude that, absent an intent to the contrary, the phrase "appropriate relief" in RLUIPA encompasses monetary as well as injunctive relief.

Having reached that general conclusion, however, it bears pointing out that a *prisoner plaintiff's* right to monetary relief is severely circumscribed by the terms of the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997(e). The PLRA provides that a prisoner may not bring a federal civil action "for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997(e); see also Napier v. Preslicka, 314 F.3d 528, 532 (11th

27

Cir. 2002) (construing § 1997(e) as barring a prisoner from obtaining compensatory damages for solely mental or emotional harm while he is in custody).

Despite this limitation, nominal damages may sometimes be appropriate under § 1997(e). See, e.g., Carey v. Piphus, 435 U.S. 247, 255, 98 S. Ct. 1042 (1978) (stating that nominal damages may be appropriate if a plaintiff establishes a violation of a constitutional right, even if he cannot prove actual physical injury sufficient to entitle him to compensatory damages). Indeed, in earlier cases this court has suggested that § 1997(e) does not preclude a prisoner from seeking nominal damages, if he can establish that he has suffered a constitutional injury. See Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003); see also Boxer X v. Donald, 169 Fed. App'x 555, 558 (11th Cir. 2006) (stating that "the PLRA's limitation on compensatory relief does not necessarily limit other forms of monetary relief," namely, nominal damages).

Here, Smith has alleged violations of RLUIPA due to the burden placed upon his religious exercise, but no physical harm. He seeks nominal, compensatory, and punitive damages. It is clear from our case law, however, that the latter two types of damages are precluded under the PLRA, Napier, 314 F.3d at 532, but that nominal damages may still be recoverable. Hughes, 350 F.3d at

28

1162. Thus, although we conclude, as a general matter, that RLUIPA's phrase "appropriate relief" contemplates monetary as well as injunctive relief, in this case it is clear that Smith's monetary award, if any, will be limited to a grant of nominal damages, in light of the limiting language of § 1997(e).

Having concluded that Smith may seek nominal damages in his section 3 RLUIPA action against the ADOC, we now must address whether Smith is entitled to bring either an individual capacity action, or an official capacity action, or both, against these defendant-appellees.

2.  Availability of an Individual Capacity Suit for Damages Under RLUIPA

The distinction between an individual capacity suit–also referred to as a personal capacity suit–and an official capacity suit is a significant one.  "When a plaintiff sues a municipal officer in the officer's individual capacity for alleged [] violations, the plaintiff seeks money damages directly from the individual officer." Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991) (citation omitted). In contrast, an official capacity suit is, essentially, "pleading an action against the entity of which an officer is an agent."  Kentucky v. Graham, 473 U.S. 159, 165, 105 S. Ct. 3099, 3105 (1985) (citation and quotations omitted).  Moreover, in an individual capacity suit, a defendant "may, depending on his position, be able to assert personal immunity defenses," such as qualified immunity.  Id. at 166-67,

29

105 S. Ct. at 3105.[8]  In contrast, in an official capacity action, "the only immunities that can be claimed . . . are forms of sovereign immunity that the entity, *qua* entity, may possess, such as the Eleventh Amendment."  Id. at 167, 105 S. Ct. at 3106.

In this case, Smith's RLUIPA action seeks damages from the defendant-appellees both in their individual and official capacities.  The case law on RLUIPA, however, is not clear as to whether the statute permits a suit for monetary damages against government employee defendants in their individual capacities.  Indeed, the district courts have been split on this question.  Compare Agrawal v. Briley, No. 02 - C - 6807, 2006 WL 3523750, at *9-10 (N. D. Ill. Dec. 6, 2006) (permitting an individual capacity suit for monetary damages under RLUIPA) and Orafan v. Goord, No. 00CU2022 (LEK/RFT), 2003 WL 21972735, at *9 (N.D. N.Y. Aug. 11, 2003) (stating that "[c]learly [RLUIPA] contemplates individual liability") with Hammons v. Jones, No. 00-CV-0143-CVE-SAJ, 2006 WL 353448, at *1 (N. D. Ok. Feb. 14, 2006) (RLUIPA only allows for official capacity actions) and Hale O Kaula Church v. Maui Planning Comm'n, 229 F. Supp. 2d 1056, 1067 (D. Haw. 2002) (stating that RLUIPA "does not appear to allow causes of action against individuals").

---

[8] For this reason, as the district court observed, "[a]bsent liability for damages in their individual capacities, there is no need for government employees to raise, and thus for the court to address, the qualified immunity defense."  See Smith, 401 F. Supp. 2d at 1246.

RLUIPA's section 3 provides that "[a] person may assert a violation of this chapter as a claim . . . in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). The term "government" is defined as:

> (i) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) a branch, department, agency, instrumentality, or official of an entity listed in clause; and (iii) any other person acting under color of State law.

Id. at § 2000cc-5.

Smith cites to this language, especially the latter references to "[an] official of an entity" and to "any other person acting under color of state law," id., as evidence that RLUIPA was designed to provide for monetary relief from *individual* governmental employees, in addition to permitting a recovery from the governmental entity itself. Smith contends that the phrase "under color of state law" in RLUIPA is similar to the "under color of" language that appears in 42 U.S.C. § 1983, which creates a cause of action against any person who, while acting "under color of any statute ordinance, regulation, custom, or usage, of any State," causes "the deprivation of any rights, privileges, or immunities secured by the Constitution." Just as the latter provides for an action against individual government employees for damages, argues Smith, so too should the former.

31

A flaw with this argument, however, is that section 3 of RLUIPA was enacted pursuant to Congress' Spending Power under Article I of the Constitution; RLUIPA "[s]ection 3 applies when the substantial burden on religious exercise is imposed in a program or activity that receives federal financial assistance." Cutter, 544 U.S. at 716, 125 S. Ct at 2118 (alterations and internal quotations omitted). Our court, in addressing other federal statutes that emanate directly from Congress' Spending Power–that is, federal statutes that condition a state's receipt of federal funding on the state's adherence to certain conditions–has repeatedly held that Congress cannot use its Spending Power to subject a non-recipient of federal funds, including a state official acting his or her individual capacity, to private liability for monetary damages. See, e.g., Hartley v. Parnell, 193 F.3d 1263, 1270 (11th Cir. 1999) (stating that individual school officials cannot be held liable under Title IX, because a Title IX claim can only be brought against the grant recipient). As we discuss below, this fact strongly militates against a recognition of a private action against an individual capacity defendant for monetary damages.

The Spending Clause of the Constitution provides, in pertinent part, that "Congress shall have the Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." U.S. CONST. art I., § 8, cl. 1. Pursuant to this

authority, the Supreme Court has held that "Congress may attach conditions on the receipt of federal funds" and may "further its broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives." South Dakota v. Dole, 483 U.S. 203, 206, 107 S. Ct. 2793, 2795-96 (1987) (citation and quotations omitted). Congress' Spending legislation typically grants federal funds to state institutions in exchange for the state's compliance with certain conditions. Such legislation has been described as creating a "contract" between the federal government and the state that receives the federal funds. See Floyd v. Waiters, 133 F.3d 786, 789 (11th Cir. 1998) (citation omitted), vacated on other grounds, 525 U.S. 802, 119 S. Ct. 33, reinstated at 171 F.3d 1264 (11th Cir. 1999). As a result, "[t]he legitimacy of Congress' power to legislate under the spending power [] rests on whether the State voluntarily and knowingly accept[ed] the terms of the 'contract.'" Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1, 17, 101 S. Ct. 1531, 1540 (1981) (citations omitted). Additionally, pursuant to this arrangement, Congress may create a funding contract that conditions the award of federal monies to the state's waiver of sovereign immunity to private lawsuits seeking to enforce the legislation. See, e.g., Franklin, 503 U.S. at 74-75, 112 S. Ct. at 1037 (finding that the Spending

33

Power permitted Congress to create a private cause of action against a state institution for a violation of Title IX).

Congress has enacted a number of laws creating a private action in the event the federal funds recipient fails to adhere to the conditions of the contract–most notably Title IX, which allows for a private cause of action when an "education program . . . receiving Federal financial assistance" subjects a person to discrimination "on the basis of sex." 42 U.S.C. § 1681(a). With Title IX, Congress effectively "condition[ed] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of funds." Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 286, 118 S. Ct. 1989, 1997 (1998) (citations omitted).

Courts, however, in addressing Title IX, have placed limits on its scope, holding that the statute does not go so far as to allow a private cause of action against an defendant in his individual capacity, since an individual defendant is not the "recipient" of the federal funds. See Floyd, 133 F.3d at 789 ("Because the contracting party is the grant-receiving local school district, a Title IX claim can only be brought against a grant recipient . . . and not an individual.") (citation, quotations, and alterations omitted). In other words, the courts have consistently recognized the limited reach of Congress' Spending Power legislation, concluding

34

that statutes passed under the Spending Clause may, as a condition of funding, subject the grant *recipient* to liability in a private cause of action, but that the Spending Power cannot be used to subject individual defendants, such as state employees, to individual liability in a private cause of action. See, e.g., id.; Hartley, 193 F.3d 1263, 1270 (same); Rosa H. V. San Elizario Indep. Sch. Dist., 106 F.3d 648, 654 (5th Cir. 1997) (stating that "Title IX does not instruct courts to impose liability based on anything other than the acts of the recipients of federal funds" and finding that "[w]hen the school board accepted federal funds, it agreed not to discriminate on the basis of sex," but that it is "unlikely that it further agreed to suffer liability whenever its employees discriminate on the basis of sex"); see also Jennings v. Univ. of N.C. at Chapel Hill, 444 F.3d 255, 268 n.9 (4th Cir. 2006), rev'd on other grounds, 482 F.3d 686 (2007) (en banc), pet. for cert. filed, (U.S. July 9, 2007) (No. 07-43) ("Title IX was enacted pursuant to Congress' spending power and prohibits discriminatory acts by funding recipients. Because school officials are not funding recipients under Title IX, school officials may not be sued in their individual capacities under Title IX."). Put simply, the federal circuits are in agreement that Title IX, because of its nature as Spending Power legislation, does not authorize suits against public officials in their individual capacities.

35

Similar to Title IX, section 3 of RLUIPA derives from Congress' power under the Spending Clause. See 42 U.S.C. 2000cc-1(b) (stating that section 3 applies in any case where "the substantial burden is imposed in a program or activity that receives Federal financial assistance"); Cutter, 544 U.S. at 716, 125 S. Ct. at 2119.[9] In Benning v. Georgia, in reviewing the constitutionality of section 3 of RLUIPA, we concluded that section 3 constituted a valid exercise of Congress' Spending Power. See 391 F.3d at 1306. In light of this Spending Clause authority, Congress may, under RLUIPA, award federal funds to state prison institutions who, as a condition of receiving federal funds, agree not to impose "a substantial burden on the religious exercise" of its prisoners. 42 U.S.C. § 2000cc-1(a).

It is much less clear, however, whether section 3 of RLUIPA should be construed as further providing a cause of action against individual defendants, such as the ADOC Committee members who have been sued in their individual

---

[9] RLUIPA also purports to contain a Commerce Clause underpinning. See 42 U.S.C. § 2000cc-1(b) (stating that RLUIPA will also apply whenever "the substantial burden affects . . . commerce with foreign nations, among the several States, or with Indian tribes"). However, the majority of courts that have addressed the statutory section before us have construed it as emanating from Congress' Spending Power. See Benning v. Ga., 391 F.3d 1299, 1306 (11th Cir. 2004); see also Madison, 472 F.3d at 124 (stating that RLUIPA "fits comfortably within Congress' Spending Clause authority"); Charles v. Verhagen, 348 F.3d 601, 607-610 (7th Cir. 2003) (same). This strikes us as an appropriate interpretation of the statute, especially since there is no evidence that a state prison's denial of a individual prisoner's request for a religious item would "affect[]" interstate commerce. 42 U.S.C. § 2000cc-1(b). Like the other courts that have addressed this statutory provision, we agree that it hinges on Congress' Spending Power, rather than its Commerce Clause Power.

36

capacities in this case.  In light of our jurisprudence construing Congress'

Spending Power in other settings, it is clear that the "contracting party" in the

RLUIPA context is the state prison institution that receives federal funds; put

another way, these institutions are the "grant recipients" that agree to be amenable

to suit as a condition to receiving funds–but their individual employees are not

"recipients" of federal funding as we have construed that term.  See Floyd, 113

F.3d at 789.[10]

We agree that a construction of RLUIPA providing for individual liability

raises substantial constitutional concerns.  Consequently, we conclude that section

3 of RLUIPA–a provision that derives from Congress' Spending Power–cannot be

construed as creating a private action against individual defendants for monetary

damages.  See id.  Thus, Smith is not entitled to pursue a claim against these

defendant-appellees in their individual capacities under section 3 of RLUIPA.[11]

---

[10] At least one district court in our circuit has already concluded that allowing an individual cause of action for damages against defendant-employees of a prison would be inconsistent with Congress' Spending Power.  See Daker, 475 F. Supp. 2d at 1341-42 ("By imposing liability on non-recipients of federal funding– individuals who are in essence involuntary and unknowing third parties to the funding contract–RLUIPA would become an example of an unprecedented and untested exercise of Congress' [S]pending power.").

[11] Moreover, because we conclude that section 3 of RLUIPA does not permit a claim against the defendant-appellees in their individual capacities, we need not address the secondary question of whether the defendant-appellees would be entitled to a defense of qualified immunity.  See, e.g., Busby, 931 F.2d at 772 (stating that the qualified immunity defense only applies when the defendant is sued individually).

3. Availability of an Official Capacity Suit for Damages Under RLUIPA

Having concluded that RLUIPA does not provide for a suit for damages against government officials in their individual capacities–since such an action would be incongruent with the reach of Congress' Spending Power–we now must address whether the statute permits an action for damages against the defendant-appellees in their official capacities. "A suit against a state official in his or her official capacity is not a suit against the official but is rather a suit against the official's office." LaMarca v. Turner, 995 F.2d 1526, 1542 (11th Cir. 1993) (citation, alteration, and quotations omitted). Such actions are not a suit against the officer personally, since the real party in interest remains the state entity, and a favorable monetary judgment ultimately imposes liability on the entity that state officer represents. See Graham, 473 U.S. at 165, 105 S. Ct. at 3105. So long as the government entity receives notice and an opportunity to respond, however, the official-capacity suit will "in all respects other than name, [] be treated as a suit against the entity." Id. at 166, 105 S. Ct. at 3105 (citation omitted).

In this case, we conclude that Smith may pursue an official capacity suit against the defendant-appellees for "appropriate relief." See 42 U.S.C. §§ 2000cc-2. RLUIPA allows for a plaintiff to seek relief in the event there is a violation by a "government," which term is defined in the statute as including, inter alia, any

"person acting under color of state law." 42 U.S.C. § 2000cc-5(4)(A)(iii). Having already concluded that the phrase "appropriate relief" includes an award of monetary damages–albeit, in Smith's case, an award limited to nominal damages–we find that nothing in the plain language of RLUIPA prohibits an action for damages against these defendant-appellees in their official capacities, that is, as officers "acting under color of state law." See id. Although it is true that these officers were sued in their official capacities in name only–as monetary liability in the event of a successful suit will ultimately be imposed on the entity that they represent, the ADOC–it is undisputed that the ADOC received notice of the action and had ample opportunity to respond to it. Graham, 473 U.S. at 165, 105 S. Ct. at 3105. Accordingly, consistent with Graham, we hold that Smith may pursue a RLUIPA action for "appropriate relief" against these defendant-appellees, in their official capacities as officers of the ADOC. See 42 U.S.C. § 2000cc-2.[12]

---

[12] The district court properly found that, based upon Graham, an action against the defendant-appellees in their official capacities, was, in essence, a suit against the state itself, since a favorable judgment would be satisfied from state coffers rather than the individual officers. The district court then stated, however, that an official capacity claim for damages under RLUIPA would be "barred by the Eleventh Amendment." Smith, 401 F. Supp. 2d at 1244.

This conclusion was in error. While it is true that "the Eleventh Amendment [will] bar federal suits against state officials in their 'official capacity,' because such actions seek recovery from state funds," see Hobbs v. Roberts, 999 F.2d 1526, 1528 (11th Cir. 1993) (citation omitted), we have previously held that, by entering into a funding contract with the federal government and accepting federal funding, state prison institutions voluntarily agreed to waive their sovereign immunity and make themselves amenable to actions under RLUIPA. See Benning, 391 F.3d at 1305-06. Indeed, in Benning, we held that section 3 of RLUIPA effectuated a clear waiver of the state's sovereign immunity under the Eleventh Amendment. Id. at 1306. We held that RLUIPA's statutory language, conditioning the receipt of federal funds on adherence to the

Thus, in addressing Smith's appeal, we must consider both Smith's claims for injunctive relief, and his official capacity claims for nominal damages, in evaluating whether the ADOC defendant-appellees were entitled to summary judgment. We now turn to the merits of those claims.

E.  Merits of Smith's RLUIPA Claims

To establish a prima facie case under section 3 of RLUIPA, a plaintiff must demonstrate 1) that he engaged in a religious exercise; and 2) that the religious exercise was substantially burdened. See Adkins, 393 F.3d at 567; 42 U.S.C. § 2000cc-1(a). The plaintiff "bear[s] the burden of persuasion on whether the . . . government practice that is challenged by the claim substantially burdens the exercise of religion." 42 U.S.C. § 2000cc-2(b). If the plaintiff succeeds in demonstrating a prima facie case, the government must then demonstrate that the challenged government action is "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b). In contrast, if the plaintiff fails to present evidence to support a prima facie case under RLUIPA, the

statute and providing that a plaintiff may seek "appropriate relief" when the statute is violated, made clear that "by accepting federal funds, [the state] waived its immunity under RLUIPA," and found that "Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA." Id. at 1305-06. In light of that holding, we conclude that the Eleventh Amendment will not shield the state (and it agents) from an official capacity action for damages under RLUIPA.

40

court need not inquire into whether the governmental interest at stake was compelling. See Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1228 (11th Cir. 2004).

Thus, to withstand summary judgment on his RLUIPA claim, Smith bore the burden of first presenting evidence to demonstrate that his observance of Odinism constituted a "religious exercise" under the statute. See Adkins, 393 F.3d at 567. A "religious exercise" is broadly defined under RLUIPA as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). In light of that definition, we conclude that Smith's practice of Odinism constitutes a "religious exercise" for purposes of a RLUIPA claim.

As to the second step–the issue of a "substantial burden" on that religious practice–Smith claims that the following decisions of the Committee effectuated a "substantial burden" on his observance of Odinism: (1) the Committee's decision to deny his request for a small quartz crystal; (2) the Committee's decision to deny Smith's request for a designated area of worship in the open area of the prison; and (3) the Committee's decision to deny Smith's request for a "small fire pit, approximately 9" in diameter and 9" deep." R2-63, Exh. K-1 at 2. We address each of these allegations in turn.

41

1. Denial of a Quartz Crystal

The Committee denied Smith the possession of a quartz crystal after reviewing his written request, as well as a number of background materials on Odinism, because there was a "lack of supporting materials validating a need for this item." R2-98, Exh. M at 1. Smith contends that this decision substantially burdened his observance of Odinism.

We have previously defined a "substantial burden" as being "significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." Midrash, 366 F.3d at 1227. More pertinent to the present action, we have made clear that, in order to constitute a "substantial burden" on religious practice, the government's action must be "more than . . . incidental" and "must place more than an inconvenience on religious exercise." Id. (citation omitted). That is, to constitute a substantial burden under RLUIPA, the governmental action must significantly hamper one's religious practice.

Here, Smith contends that the fact that the quartz crystal was denied outright should be sufficient, standing alone, to demonstrate that his religious practice was substantially burdened. The Committee's denial alone, however, does not necessarily establish a substantial burden. Rather, in reviewing the entirety of the record evidence, we find that Smith has failed to present sufficient evidence to

42

demonstrate how, if at all, the ADOC's denial of a small quartz crystal constituted a "substantial burden" on his practice of Odinism. See 42 U.S.C. § 2000cc-1(a).

The decision to ultimately deny Smith's request for a quartz crystal was reached after the Committee undertook a probing and thorough review of Smith's religious requests. The ADOC Chaplain personally met with Smith to discuss his request, including the need for the crystal; reviewed documentation on Odinism submitted by Smith's non-incarcerated friend; conducted independent research on the tenets of Odinism; held discussions with Chaplains in other prisons on the religion's doctrines; and encouraged Smith to submit as much evidence as he could in support of his request. In conducting his review, the Chaplain found that the evidence in support of Smith's request for a small quartz crystal was "incomplete and sketchy." R2-63, Exh. K at 3. After "gather[ing] more informative sources on [his] own" and "research[ing] the [credibility]" of each of Smith's requested items, id., the Chaplain found that there were no "supporting materials validating [the] need" for a crystal in connection with Smith's practice of Odinism, and, accordingly, the Committee denied that item. R2-98, Exh. M at 1.[13]

---

[13] We also note that the Committee's denial of the quartz crystal should be placed in the larger context of its 2003 decision–a decision in which the Committee granted Smith's requests for, among other things, a Thor's hammer necklace; a candle in his cell; a fern tree; a number of religious "runes" to be used in practicing the Odinist faith; as well as permission to have a designated day of the week to practice his Odinism; and permission to recognize four Odinist holidays. Put simply, as the district court found, the Committee granted almost the entirety of

43

In challenging that decision on appeal, Smith has presented no evidence to demonstrate that a small quartz crystal was fundamental to his practice of Odinism, such that the denial of the crystal effectuated any "more than an inconvenience on [his] religious exercise." See Midrash, 366 F.3d at 1227. Indeed, Smith has failed to establish the relevance of the crystal to his practice of Odinism, as he was obligated to do in order to demonstrate that the denial of that item would significantly hamper his religious observance. Smith's request states only that the crystal was "essential" because it "allows communication with the netherworld." R1-20, Exh. K. Similarly, the sources on Odinsim that were submitted by Smith stated, in rather general terms, that "[q]uartz crystals are used in shamanism around the world," that they are used in many prehistoric religions, such as "Old world alchemy, witchcraft, and magic," and that they are "still in use in many traditional societies." R2-61. There is no mention in these third party sources of Odinism, nor is there any indication that a small, quartz crystal is necessary to observe the rites of Odinism.

In short, neither Smith's request, nor the outside sources that he submitted in connection with it, demonstrate the need for a quartz crystal in order to practice Odinism. While it is true that courts are not to inquire into the centrality of a

_____

Smith's request, permitting him to have a number of religious items to practice his Odinism; the one physical item it denied was the crystal.

particular religious tenet in undertaking the substantial burden analysis, <u>Adkins</u>, 393 F.3d at 559, at a minimum the substantial burden test requires that a RLUIPA plaintiff demonstrate that the government's denial of a particular religious item or observance was more than an inconvenience to one's religious practice.  <u>See</u> <u>Midrash</u>, 366 F.3d at 1227.

On appeal, Smith argues that a substantial burden can be found based on the simple fact that (1) he asked for the crystal to use in Odinism; (2) the request was based on Smith's "sincer[e]" religious beliefs; and (3) the Committee flatly denied that request.  Br. Of Appellant at 47.  Smith contends that this evidence should be enough, standing alone, to demonstrate that his religious exercise was substantially burdened under RLUIPA.  Such an expansive reading of section 3, however, would require us to find a substantial burden whenever *any* request in connection with a sincere religious belief was denied by a state prison.  If the word "substantial" in the statutory phrase "substantial burden," 42 U.S.C. § 2000cc-1(a), is to retain any meaning, it must, at a minimum, be construed as requiring something more than solely the denial of a request that is sincere.  An alternate approach, like the one advocated by Smith, would result in the word "substantial" in § 2000cc-1(a) as being mere surplusage, since every governmental action denying a requested item

to be used in religious observance would give rise to a prima facie RLUIPA claim. We decline to adopt such an expansive reading of section 3 of RLUIPA.

Put simply, we are not convinced–and there is no evidence, other than Smith's own assertion and his scant sources, to establish–that the Committee's decision denying Smith a small, quartz crystal "place[d] more than an inconvenience on [his] religious exercise." See Midrash, 366 F.3d at 1227. If anything, the denial of the crystal strikes us as an "incidental" burden on Smith's Odinism, which, we have held, is not sufficient to meet the threshold of a substantial burden under RLUIPA. See id.

Because Smith did not present evidence to demonstrate a substantial burden on his Odinist observances by the denial of the crystal, he failed to establish a prima facie case under RLUIPA, and the defendant-appellees are entitled to summary judgment on Smith's RLUIPA claim. See id. at 1228 (summary judgment is appropriate if the RLUIPA plaintiff fails to make out a prima facie case, and the court need not inquire into whether the government interest asserted is compelling). See also Johnson, 263 F.3d at 1243 (summary judgment is appropriate if the party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial") (quotations and citation omitted).

2. Denial of a Designated Area of Worship

Smith also argues that the ADOC's decision to deny his request to be granted a designated area of worship in an open area of the prison effectuated a substantial burden on his practice of Odinism. The Committee denied Smith's request for a designated area of worship, due to its concerns that permitting Odinist rites to be performed in a public area of the prison, before all the inmates, could pose security problems. The Committee's decision stated that

> The Asatru / Odinism religion draws and embraces certain members of the Aryan Nations and Neo-Nazis, which combined with a potentially hostile inmate population and the prevalence of prison gangs, would be detrimental to security and [pose] a strong potential for harm.

R2-98, Exh. M at 2. The Committee did grant Smith a secure location to practice his Odinist rites, stating that when a secure place of worship was required, the Warden and Chaplain would designate a suitable location for Smith to engage in his observances.

Upon review, we find that Smith has failed to establish that this decision–to allow Smith to practice his religion freely in a secure location while declining to allow his observances in the general prison area–significantly hampered his religious exercise. As discussed in the previous section, a substantial burden must "place more than an inconvenience on [one's] religious exercise." See Midrash,

47

366 F.3d at 1227. Here, there is no evidence that the ADOC's decision to limit Smith's religious practices to a secure location placed "more than an incidental" burden on his practice of the Odinist faith. See id. On the contrary, Smith remained free to engage in his religious observances under the Committee's 2003's decision, albeit limited to a secure, rather than an open, area of the prison.

In addition, as with the quartz crystal, Smith has failed to demonstrate on appeal how, if it all, the decision to deny Smith a designated worship area, in the open area of the prison, effectuated a "substantial burden" on his individual practice of Odinism. 42 U.S.C. § 2000cc-1(a). In fact, the outside sources that Smith submitted in connection with his request did not make any mention of the need for a "designated worship area" in connection with the practice of Odinism. See generally R2-61. Because Smith failed to submit evidence to establish his prima facie case, the defendant-appellees were entitled to summary judgment on Smith's RLUIPA claim based on the denial of a designated worship spot. See Midrash, 366 F.3d at 1228.

3. Denial of a Small Fire

Finally, Smith challenges the ADOC Committee's decision to deny his request for a small fire pit. Smith's original request sought a "small fire pit, approximately 9" in diameter and 9" deep," in which he would be able to light a

48

pine fire. R2-63, Exh. K-1 at 2. The Committee granted this request only in part, allowing Smith possession of a small candle to be used in connection with his Odinist exercises. Smith contends that this decision effectuated a substantial burden on his religious exercise under section 3 of RLUIPA.

We disagree. As with Smith's request for a crystal, Smith failed to present record evidence to establish the need for, or relevance of, a 9" by 9" fire pit in connection with his Odinist practices, such that the denial of this item would effectuate a substantial burden his religious observance. As noted, the ADOC did grant Smith a candle to use in his cell in his observance of Odinism. On appeal, Smith has failed to demonstrate how, if at all, the decision to limit him to a candle, rather than to a full-blown fire pit, significantly hampered his practice of Odinism. See Midrash, 366 F.3d at 1227. As with the ADOC decision on a secure worship spot, the record demonstrates that Smith remained free to engage in his religious observance under the ADOC 2003 decision, albeit limited to a candle rather than a pine fire.

Moreover, like the first two requests, Smith has failed to demonstrate how the ADOC's decision to limit him to a small candle effectuated a substantial burden on his religious practice. The sources that he submitted in connection with this request alluded to the Kenaz rune being representative of "the pine fire of

49

purification." R2-63, Exh. K-1, but there was no mention of the need for a pine fire in connection with the practice of Odinism. See id.; see also R1-20, Exh. M (discussing in general how the rune symbolizes a pine tree giving heat and light); R2-61 (stating that the rune "refers to the sacredness of the hearth and ritual cleansing by fire"). The Chaplain found, and we agree, that the sources that Smith submitted did "not show[] the necessity of [a pine] fire" in connection with the Odinist rites. See R1-20, Exh. C. Failing such evidence, we are unable to find how, if at all, the denial of a pine fire pit effectuated a substantial burden on his observance of Odinism. Because Smith failed to submit evidence to establish a prima facie RLUIPA case based on the denial of the pine fire pit, the defendant-appellees were entitled to summary judgment on Smith's claim. See Midrash, 366 F.3d at 1228.

In summary, having reviewed Smith's claims for injunctive relief and nominal damages under RLUIPA–based on the ADOC's denial of a crystal, a worship area, and a fire pit–we conclude that none of the three violations was sufficient to establish a prima facie claim under RLUIPA. Nor can we conclude that the Committee's disposition of Smith's three requests, taken collectively, was sufficient to establish that Smith's religious practice was significantly hampered, so as to give rise to a prima facie RLUIPA case. Accordingly, we conclude that the

50

defendant-appellees were entitled to summary judgment. And although the district court's decision to grant summary judgment to the defendant may have been reached on the basis of qualified immunity, "we may affirm the district court's decision on any adequate ground, even if it is other than the one on which the court actually relied." Parks, 43 F.3d at 613 (citation omitted). Because we conclude that summary judgment was properly entered for the defendant-appellees, we affirm the district court's summary judgment order on Smith's RLUIPA claims.

### III. CONCLUSION

Smith has challenged the district court's disposition of his claims brought pursuant to RLUIPA, raising a number of separate issues on appeal. After reviewing the record and briefs of the parties, and having had the benefit of oral argument, we conclude that RLUIPA's remedies section, which generally allows for "appropriate relief," may, in some cases, allow for the recovery of monetary damages, where appropriate. 42 U.S.C. § 2000cc-2. We conclude, however, that under section 3, such a recovery only extends to an action brought against state officials in their official capacities; a RLUIPA claim for damages against a state official in his individual capacity is not viable under section 3 of RLUIPA.

Having resolved these broader legal questions, in Smith's particular case we conclude that he failed to establish a prima facie RLUIPA violation under section

3, and, accordingly, that the district court acted properly in granting summary judgment in favor of the defendant-appellees.  Accordingly, we **AFFIRM** the judgment of the district court.

EDMONDSON, Chief Judge, **CONCURS** in the result.