# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

June 18, 2012

No. 11-10218

Lyle W. Cayce
Clerk

ANSON MCFAUL,

Plaintiff-Appellant,

versus

DANIEL VALENZUELA, Chaplain-Preston Smith Unit,
in His Individual and Official Capacity;
BILL PIERCE, Director of Chaplaincy Department,
in His Individual and Official Capacity;
GARY GRIGGS, Assistant Warden-Preston Smith Unit,
in His Individual and Official Capacity;
RICHARD D. VOGELGESANG, Warden-Preston Smith Unit,
in His Individual and Official Capacity;
BRAD LIVINGSTON, Director of the Texas Department of Criminal Justice,
in His Individual and Official Capacity,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Texas

Before DAVIS, SMITH, and DENNIS, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

No. 11-10218

Anson McFaul, a Texas prisoner, filed this *pro se* civil rights complaint against Daniel Valenzuela, the chaplain of the Preston Smith Unit ("Smith Unit"); Bill Pierce, the Director of the Chaplain Department; Richard D. Vogelgesang, the Smith Unit warden; Gary L. Griggs, the Smith Unit assistant warden; and Brad Livingston, the Director of the Texas Department of Criminal Justice ("TDCJ"). McFaul alleges that on May 22, 2009, he was denied religious devotional items that Valenzuela had given him permission to order. McFaul alleged violations of his rights to free exercise of religion under the First Amendment, constitutional rights under the Equal Protection Clause of the Fourteenth Amendment, and statutory rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Texas Religious Freedom Restoration Act ("TRFRA"). The district court granted summary judgment in favor of the defendants. McFaul appeals *pro se*, and we affirm.

## I.

Because we are evaluating a summary judgment, we present the facts in the light most favorable to McFaul. *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010). McFaul claims that he showed Valenzuela a picture of prayer beads and a medallion and told him the price when he originally requested permission to make the purchase, but Valenzuela refused to give him the items once they were delivered. McFaul also claims that he obtained permission to order a mirrored pentagram costing $61.95, but when it was delivered on July 2, 2009, Valenzuela refused to release it to him because it was too costly. Valenzuela told McFaul in front of witnesses that he would "never get anything" if he continued to file grievances; McFaul had filed grievances against Valenzuela regarding his free exercise of religion.

McFaul asserts that other prisoners engaged in mainstream religions were permitted to purchase devotional items, but he was not allowed to do so, in viola-

No. 11-10218

tion of his religious rights. He maintains that all defendants were aware of the complained-of constitutional violations, because he had written letters and filed grievances. McFaul contends that denying devotional items as "too expensive" or "inappropriate" did not constitute the least restrictive means to protect a governmental interest, particularly because inmates working in prison craft shops created jewelry costing more than the devotional items in question.

## II.

McFaul requested a declaratory judgment that the defendants had violated his rights, an injunction permitting him to purchase his devotional items, compensatory damages of $99.85 for the denied religious items, and punitive damages of $150. He also sought appointment of counsel. The district court denied counsel but granted McFaul leave to proceed *in forma pauperis*.

## A.

The district court directed a magistrate judge ("MJ") to hold a hearing pursuant to *Spears v. McCotter*, 766 F.2d 179 (5th Cir. 1985). At the hearing, McFaul asserted that he was a Celtic Druid. He stated that he had learned rituals and magic through word of mouth from other Celtic Druids and that his religion involved periodic "ritual salutations to the sun" at specific times of day. He also stated that he needed a medallion and prayer beads to practice his faith, but Valenzuela told him that the requested items were inappropriate and that he needed to get a Wiccan star or a pentagram.

McFaul described the first medallion he ordered as a triskele, which represents the "three forces of nature," which could mean water, air, and earth or "any groups of three you might think of" that occur in nature. He explained that the prayer beads would "help [him] concentrate when [he is] praying on each bead" and that the triskele medallion is "integral to [his] religion" because it symbo-

lizes "all the threes in nature." According to McFaul, the triskele medallion can be worn at all times for protection, but it is necessary to wear it only while practicing his religion.

After his first order was rejected, McFaul ordered a pentagram medallion to be more compliant with Valenzuela's instructions. He explained that the pentagram he ordered could be used in the same way as the triskele, because it contained a black onyx gemstone that would "allow [him] to connect with Mother Earth a little better" and because he used a pentagram during religious rites. He was unaware of a prison policy forbidding possession of a medallion exceeding $25 until he received the response to his grievance about the pentagram. He stated that another prisoner was allowed to have a "14k gold inverted pentagram," which cost more than McFaul's desired medallion. He also noted that the craft shop at another prison unit made rosaries costing more than his medallion; he believed that prisoners were permitted to make and possess such devotional items.

McFaul currently has a Wiccan medallion. He no longer practices that faith, however, and he does not use the Wiccan medallion in the practice of his current religion. He searched the prison catalog to find an appropriate medallion but has been unable to do so, because "the black onyx gemstone . . . really connects me to the Earth, and . . . also connects to the moon and the moon is important in [Celtic Druid] ritual." McFaul explains that he is "in grave danger" by practicing his magic without the "bare minimum" protection of the medallion. He admits that he was performing the basic rites, but he is unable to "do the full invoking ritual of the pentagram," because he lacks protection.

McFaul claims that on one occasion when he asked about his medallion, Valenzuela told him that he "was gonna burn in Hell and all pagans were going to burn in Hell." When McFaul told Valenzuela that he was going to file a grievance based on the denial of his medallion, Valenzuela told him that he would

4

No. 11-10218

"never get anything" if he kept filing grievances. McFaul had filed grievances against Valenzuela in 2005 for denying him a medicine pouch.

## B.

Following the *Spears* hearing, the defendants were served and filed an answer generally asserting that McFaul was not entitled to relief. McFaul again requested appointment of counsel, asserting that his incarcerated status would prevent him from conducting the intensive research needed to prevail on his claims and that an attorney would be better able to present evidence and cross-examine witnesses. The court denied the motion, concluding that McFaul had failed to show extraordinary circumstances.

McFaul also moved for leave to engage in discovery, requesting that the court hold a conference pursuant to Rule 26(f) of the Federal Rules of Civil Procedure and that the court compel the defendants to comply with his requests for documents. The defendants asserted that much of McFaul's requested documentation was irrelevant and that they had provided copies of relevant requested information. McFaul responded that all requested documents were relevant to his case, that all defendants were responsible for creating a policy or custom of encouraging the violation of prisoners' right to exercise their religion, and that the majority of the documents sent to him were items already within his possession.

McFaul sought to compel Griggs to respond to his interrogatories. The defendants asserted that the responses had been provided, and they repeated that all relevant documents had been produced. McFaul maintained that the answers to queries that the defendants found irrelevant could assist him by revealing additional witnesses or establishing the defendants' intent to deprive prisoners of their rights to exercise their religion. The defendants moved for protection from discovery, asserting an intent to raise a defense of qualified

5

No. 11-10218

immunity. The court ultimately denied the motions to compel. It granted the protective order in part but ordered the defendants to provide responses to a limited number of McFaul's interrogatories.

The defendants moved for summary judgment, asserting that McFaul's allegations were insufficient to warrant relief and that there was no genuine issue of material fact. McFaul responded, arguing that the items approved by TDCJ and the Smith Unit for Neo-Pagan religions were not appropriate for Celtic Druidism, that his requested items were necessary to the practice of his religion, and that the defendants had placed a substantial burden on the free exercise of his religion.

C.

The MJ issued a report recommending that summary judgment be granted and that McFaul be denied relief on his civil rights claims. According to the report, McFaul did not show that the failure of prison officials to give him the bone skull necklace, the triskele pendant, and the mirrored black pendant placed a substantial burden on his exercise of religion under RLUIPA or TRFRA, because McFaul had not explained his need for the items and instead had presented evidence that adherents to Celtic Druidism could not reveal the secrets of the religion. The report also found that McFaul had failed to state a First Amendment claim, because the prison rules were neutral and reasonably related to penological interests, that he could obtain other medallions in support of his faith, and that he had failed to present evidence of alternatives. Finally, the MJ found that McFaul had failed to establish a denial of equal protection, because he did not show purposeful discrimination among similarly situated offenders.

McFaul submitted objections to the report, asserting that he had presented evidence at his *Spears* hearing and through documentation from his religious teacher explaining why the items were necessary to his faith, that the defen-

6

No. 11-10218

dants' reasons for denying the items were not legitimate, and that another inmate had obtained a medallion costing over $50. He also argued that the defendants should not have been granted a protective order from discovery, because they could have obtained more information about the prisoner who obtained a medallion costing over $50. Finally, McFaul objected to the MJ's jurisdiction on account of the defendants' never having consented to it.

The district court conducted an independent review of the record, overruled McFaul's objections, adopted the report, and granted summary judgment. On appeal, McFaul challenges the summary judgment and various procedural aspects of the case, including the denial of discovery and counsel and the jurisdiction of the MJ.

## III.

### A.

This court reviews a summary judgment *de novo*, using the same standard as that employed by the district court. *Carnaby v. City of Hous.*, 636 F.3d 183, 187 (5th Cir. 2011). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). In reviewing summary judgment, this court construes "all facts and inferences in the light most favorable to the nonmoving party." *Dillon v. Rogers*, 596 F.3d 260, 266 (5th Cir. 2010) (internal citation and quotation marks omitted). Summary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence. *Hathaway v. Bazany,* 507 F.3d 312, 319 (5th Cir. 2007).

### B.

McFaul contends that he presented sufficient evidence showing a genuine

dispute of material facts related to his First Amendment claims. During the *Spears* hearing, he alleged that he needs his devotional items to practice his faith, and similar allegations were made by his spiritual advisor in affidavits. Because of the "oral tradition" of Celtic Druidism, McFaul argues that the court should give more weight to "[o]ral evidence than to doctrinal justification." Accordingly, his inability to possess the medallions stifles his ability to practice Celtic Druidism.

"[I]nmates retain their First Amendment right to exercise religion; however, this right is subject to reasonable restrictions and limitations necessitated by penological goals." *Hicks v. Garner*, 69 F.3d 22, 25 (5th Cir. 1995) (footnotes omitted). A restriction "impinging on an inmate's constitutional rights must be upheld 'if it is reasonably related to legitimate penological interests.'"[1] To evaluate the reasonableness of a prison restriction, this court considers (1) whether the regulation or action has a logical connection to the legitimate governmental interests invoked to justify it; (2) whether the inmate has an available alternative means of exercising the rights; (3) the impact of accommodation on other inmates, guards, and prison resources; and (4) the presence or absence of ready alternatives that fully accommodate the prisoner's "rights at *de minimis* cost to valid penological interests."[2] "A court must determine whether the government objective underlying the regulation at issue is legitimate and neutral, and that the regulations are rationally related to that objective." *Freeman v. TDCJ*, 369 F.3d 854, 860 (5th Cir. 2004) (internal quotation marks and citation omitted). Due regard also must be given to the decisions of prison officials, because

---

[1] *Florence v. Bd. of Chosen Freeholders of the Cnty. of Burlington*, 132 S. Ct. 1510, 1515 (2012) (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987)); *Mitchell v. Quarterman*, 2012 U.S. App. LEXIS 9788, at *6 (5th Cir. May 15, 2012) (per curiam) (unpublished).

[2] *Safley*, 482 U.S. at 89-91; *see Mitchell*, 2012 U.S. App. LEXIS 9788, at *6; *Baranowski v. Hart*, 486 F.3d 112, 120-22 (5th Cir. 2007).

No. 11-10218

"'prison administrators . . . , and not the courts, [are] to make the difficult judgments concerning institutional operations.'"[3]

### 1.

The district court concluded that the TDCJ policy limiting religious medallions to $25 is reasonably related to penological interests, including safety, security, and discipline. It accepted the affidavit of Robert Eason, a TDCJ Regional Director, who stated that McFaul could grind his pentagram into shards to hurt others, that uniform sizes of medallions make it easier for guards to identify contraband, and that McFaul could trade unique items such as the skull necklace and the triskele medallion for contraband. The court decided that these interests are rationally related to the $25 limitation and that McFaul had presented no evidence to show that the policy was not applied neutrally. It also found that McFaul was provided an opportunity to exercise his faith, because the prison offered two medallions approved for Neo-Pagan faiths, that accommodating McFaul and other prisoners would cause guards to spend more time trying to ascertain whether inmates possessed contraband, and that the strength of the first three *Safley* factors outweighed any alternative accommodations that could be presented by McFaul.

There is no dispute that the items sought by McFaul did not conform to the prison requirements. Although a pentagram is approved for neo-Pagan religions, the black background of McFaul's mirrored pentagram distinguished it from the approved medallion, and it cost more than the $25 limit. The issue is whether the prohibitions on nonconforming medallions and medallions costing more than the prescribed amount violate the Free Exercise Clause.

The penological interests offered by the defendants—safety and discipline

---

[3] *Safley*, 482 U.S. at 89 (omission and alteration in original) (citing *Jones v. N.C. Prisoners' Union*, 433 U.S. 119, 128 (1977)).

No. 11-10218

—have been found to be legitimate in other Free Exercise cases.[4] McFaul argues, however, that the $25 limitation that prevented him from obtaining his black onyx pentagram was not neutral, because the prison had a procedure in place that permitted it to approve more expensive religious items. He contends that such exceptions may be used to "covertly suppress particular religious beliefs that are not mainstream."

Although the existence of exceptions may give rise to concern under another set of facts, McFaul has presented no evidence demonstrating such discrimination. The only example he offers of the prison's granting such an exception was for a Satanist. Because he does not appear to be asserting that Satanism is a "mainstream" religion, his single example indicates that the price limitations are not used to repress the practice of nontraditional religions.

McFaul also argues that the prison's claims of uniformity and security concerns are irrational. He maintains that any considerations about uniformity are frivolous in light of the variety of approved religious items available. Although McFaul is correct that prison officials have approved a number of different medallions for different religions, he has not shown that the desire for uniformity is not a valid penological concern. As Eason stated in his affidavit, prison guards can more easily become familiar with a limited number of approved medallions, and requiring them to determine whether any non-conforming medallion is worn for religious purposes or constituted contraband would be impracticable.[5]

---

[4] *See, e.g., Green v. Polunsky*, 229 F.3d 486, 490 (5th Cir. 2000) (stating that prison grooming policies requiring short hair and no beards allow for rapid identification, prevent concealment of contraband and weapons, and limit signals of gang affiliations); *Mitchell*, 2012 U.S. App. LEXIS 9788, at *7 (stating that safety is a legitimate reason to overcome religious objection to being seen naked by a guard of the opposite sex).

[5] *See Green*, 229 F.3d at 491 (concluding that allowing exceptions of short beards for religious purposes would be impractical based on the number of inmates who would likely

(continued...)

No. 11-10218

With respect to the prison's concerns that glass-like substances in the pentagram could be broken into shards and used as weapons, McFaul notes that equally dangerous nonreligious items are available for prisoners to purchase in the commissary. In particular, he notes that they may buy light bulbs, which may also be broken and made into weapons. He attempts to analogize his case to *Mayfield v. TDCJ*, 529 F.3d 599, 610-11 (5th Cir. 2008), in which this court considered a prison policy prohibiting the possession of rune stones by Odinists. In *Mayfield*, the plaintiff argued that the prohibition against rune stones was irrational, because they were similar to Scrabble tiles or other game pieces that prisoners could possess. *See id.* at 611. We ruled for the state for First Amendment purposes, however, concluding that "issues of prison security are peculiarly within the province and professional expertise of corrections officials" and deferring to the expert judgment of such officials in concluding that the security concerns constituted a legitimate penological interest. *Id.* (internal quotation marks and citation omitted).

Furthermore, the prison does not wantonly hand out light bulbs but requires each prisoner to turn in his expired bulb before he may obtain a new one. Because it is fairly easy to tell which prison cells do not have a light bulb, the opportunities to grind it into a weapon are limited.

McFaul also contends that prisoners on other units are allowed to possess medallions with semiprecious stones, but he has provided no evidence of that. During the *Spears* hearing, McFaul noted that prisoners could work in a craft shop that made rosaries from semiprecious stones and other valuable items. He presented his belief that prisoners could possess such religious items, apparently because a prisoner was required to have $100 to start up a craft shop.

---

[5] (...continued)
request such an exception from the grooming rules and the need for administrators to determine the legitimacy of stated beliefs).

No. 11-10218

In his appellate brief, McFaul relies on a newspaper article presented in the district court to support his assertion that "on the Stevenson Unit, piddlers are allowed to possess and make rosary beads (a Religious Devotional Item) made out of semi-precious natural stones." The front page of the article, which is the only part submitted to the court, reflects that prisoners do make rosaries out of semiprecious materials, but there is no indication that they may possess the materials outside the craft shop or that they are allowed to purchase completed rosaries. McFaul's unsupported assertion that other prisoners are allowed generally to possess such items is insufficient to establish that officials do not have a legitimate penological interest in preventing the general possession of such valuable materials.

2.

To determine whether there is an alternative way for the prisoner to exercise his right to practice his religion, courts consider "whether the regulation entirely stifles the prisoner's religious expression." *Scott v. Miss. Dep't of Corr.*, 961 F.2d 77, 81 (5th Cir. 1992). McFaul testified at his *Spears* hearing that he was able to do daily rituals at morning, noon, sunset, and midnight despite the deprivation of his medallions and his necklace. He contended, however, that he was unable to engage in ritualistic magic ceremonies because he lacked a medallion to protect him. Where an inmate is unable to engage in a particular religious practice, courts consider "whether under these regulations [prisoners] retain the ability to participate in other . . . religious ceremonies." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 352 (1987). The Supreme Court concluded that rules requiring prisoners to stay at work all day and prohibiting Muslim prisoners from attending Jumu'ah could be upheld, even though there was no alternative to attending Jumu'ah, because Muslim prisoners had other avenues to practice

12

No. 11-10218

their religion.[6]

The only Celtic Druid rituals specifically testified to by McFaul were the ritual salutations occurring four times daily, which he was still able to perform. Although he also asserted he needed the medallions to protect him during magic rituals, he did not explain what these rituals entailed or whether and why they were necessary, other than his assertion that "the full invoking ritual of the pentagram" was "required by [his] faith." Although McFaul provided a sworn statement and a letter from Byron Holmes, his "spiritual teacher," Holmes provided no explanation of the rituals' importance to Celtic Druidism or why the medallions were necessary; instead, he asserted that practitioners "are sworn to silence in certain mysteries of [the] religion."

Thus, McFaul has provided nothing for this court to credit. Given his admission that he was able to engage in some of the observances necessary to his religion, his inability to participate in other "required" rituals does not show an absence of alternatives. *See id.* at 351-52.

3.

The third *Safley* factor is the impact of accommodation on other inmates, guards, and prison resources. *Safley*, 482 U.S. at 91. As noted above, permitting prisoners to possess medallions that do not conform to the approved standard would cause prison guards extra effort in determining whether items are permitted religious medallions or contraband items. In addition, there is a danger that prisoners could fight over or steal medallions that are perceived as more valuable than the standard items offered. Such increases in costs weigh in favor

---

[6] *Estate of Shabazz*, 482 U.S. at 351-52; *see also Green*, 229 F.3d at 491 ("Neither does the TDCJ grooming policy deprive Muslim inmates of 'all means of expression' of their religious beliefs. It merely removes or reduces one of many avenues by which they may manifest their faith.") (internal footnote and citation omitted).

No. 11-10218

of the prison's policies. *See Green*, 229 F.3d at 491.

4.

The final *Safley* factor is the presence or absence of ready alternatives that fully accommodate the prisoner's "rights at *de minimis* cost to valid penological interests." *Safley*, 482 U.S. at 91. The court noted that McFaul had not posited any alternatives. It also concluded that "even if he had, the weight of the other three factors shows that the regulation is valid." McFaul maintains that the court erred by not considering the reasonable alternative of limiting the religious items available to prisoners in a neutral manner.

McFaul failed to offer any evidence, however, that the prison's application of the policy was not applied neutrally. As noted above, he alleges only one instance of the prison's granting an exception to the policy, and it was for a Satanist. Under the circumstances, McFaul has not established the existence of a genuine issue of material fact regarding whether defendants violated his First Amendment free-exercise rights.

IV.

McFaul appeals the dismissal of his claim that the defendants violated his statutory rights under RLUIPA, 42 U.S.C. § 2000cc, and TRFRA, TEX. CIV. PRAC. & REM. CODE § 110. Those statutes prevent governments from imposing a substantial burden on religious exercises by inmates without a compelling governmental interest. Because McFaul fails to offer evidence beyond a mere assertion that the prison's policies substantially burden the exercise of his religion, we affirm the dismissal of his statutory claims.

"RLUIPA imposes a higher burden than does the First Amendment in that the statute requires prison regulators to put forth a stronger justification for regulations that impinge on the religious practices of prison inmates." *Mayfield*,

14

529 F.3d 599, 612 (5th Cir. 2008). Under RLUIPA, "[n]o government shall impose a substantial burden on the religious exercise of [an inmate] . . . unless the government demonstrates that imposition of the burden on that person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). "[T]he plaintiff bears the initial burden of proving that the challenged government action substantially burdens the plaintiff's religious exercise." *DeMoss v. Crain*, 636 F.3d 145, 150 (5th Cir. 2011) (internal quotation marks and citation omitted).

To establish a "substantial burden," the prisoner must show that "it truly pressures the adherent to significantly modify his religious behavior and significantly violate his religious beliefs." *Adkins v. Kaspar*, 393 F.3d 559, 570 (5th Cir. 2004). Such a burden is shown if the prisoner is influenced to act in violation of his religious beliefs or is forced to choose between enjoying a generally available benefit and following his religious beliefs. *Id.* "If the plaintiff meets this burden of proof, the burden shifts to the government to demonstrate that its action was supported by a compelling interest and that the regulation is the least restrictive means of carrying out that interest." *DeMoss*, 636 F.3d at 150 (internal quotation marks and citation omitted). Claims under TRFRA may be resolved by consideration of case law applying RLUIPA and its predecessor, the Religious Freedom Restoration Act of 1993. *A.A. ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 611 F.3d 248, 258-59 (5th Cir. 2010). McFaul is not entitled to monetary damages under RLUIPA.[7] Accordingly, we analyze only his claims for declaratory and injunctive relief under RLUIPA.

The district court concluded that McFaul failed to satisfy his initial burden because he did not show how the TDCJ policies acted as a substantial burden on

---

[7] *See Mitchell*, 2012 U.S. App. LEXIS 9788, at *9 (citing *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 321-22 (5th Cir. 2009), *aff'd*, 131 S. Ct. 1651, 1663 (2011)).

No. 11-10218

his ability to practice his religion. The court based its conclusion on the affidavit from McFaul's "spiritual advisor" indicating that practitioners of Celtic Druidism may not talk about the practices of the religion. A review of the record indicates that McFaul did provide *some* explanation of the rituals during his *Spears* hearing. Nevertheless, his silence regarding the doctrines of the religion prevents him from showing that the burdens on his religious exercise are substantial.

During the *Spears* hearing, McFaul asserted that he needed the prayer beads to help him concentrate during his prayers. He also claimed that if he wore the triskele pendant while he was practicing magic, he would "put all [his] energy" or "charge the medallion" and it would protect him during his rituals. He acknowledged, however, that the pentagram amulet would perform the same function, that the black onyx in it would help him "connect with Mother Earth a little better," and that the pentagram could be used in rituals, although "the Triskele would [have] better fit [his] practice." He maintained that a pentagram without the black onyx would be less effective, because the shape was only "a symbol in a gateway into whatever element like the Earth through the moon" that the practitioner is attempting to enter. Although McFaul admitted that he was able to practice his daily observances, he was unable to conduct "the full invoking ritual of the pentagram," because he lacked an amulet to protect himself while performing the necessary spells. Thus, he has provided evidence that the lack of an onyx on his pentagram somewhat interferes with the exercise of his religion, but he has not met his burden to show that the interference is substantial.

In *Smith v. Allen*, 502 F.3d 1255, 1277-79 (11th Cir. 2007), *abrogated on other grounds by Sossamon v. Texas*, 131 S. Ct. 1651 (2011), the court confronted the issue of whether the substantiality of a burden can be demonstrated by the mere assertion of an inmate. *Smith* considered a claim by an Odinist that his inability to obtain a quartz crystal constituted a substantial burden on the prac-

tice of his religion. Smith asserted that the crystal was necessary to his religion because it permitted him to communicate with the netherworld, and he presented general sources that reflected that quartz crystals are used in many prehistoric religions, although they did not list Odinism. *Id.* at 1278. He maintained that he had established a RLUIPA violation because he asked for the crystal, and he said that he needed it to follow his sincerely held religious beliefs. *Id.* The court rejected that assertion, stating that "[s]uch an expansive reading . . . would require [courts] to find a substantial burden whenever *any* request in connection with a sincere religious belief was denied by a state prison." *Id.* at 1278. The court concluded that "Smith's own assertion and his scant sources" were insufficient to establish that he had suffered more than an inconvenience rather than a substantial burden. *Id.* at 1278-79.

In *Sossamon*, 560 F.3d at 333, however, this court concluded that a prison's prohibition of an inmate's access to a chapel to pray before a cross and altar could constitute a substantial burden on religious exercise, even though a cleric swore that such activities were not a necessary practice of Christianity. We noted that *Smith* did not contradict this conclusion, observing that Smith had received numerous devotional items related to his religion and was still able to practice Odinism. *Id.* at 332-33 n.64. We reasoned that "[t]he denial of the quartz crystal . . . is markedly different from a wholesale denial of what Sossamon claims is core to the practice of his Christianity, at least for summary judgment purposes." *Id.*

Thus, Sossamon established a factual dispute regarding whether the prison's actions interfered with a practice he considered core to his Christian beliefs. McFaul, in contrast, has at best provided mixed evidence regarding the centrality of the onyx and prayer beads. Furthermore, by stating that he will not discuss the doctrines of his religion, he has provided evidence that proceeding beyond summary judgment would be especially fruitless.

No. 11-10218

Without some religious framework, claims such as McFaul's would open the door to finding that any inmate's assertion constitutes a sincerely held religious belief and that any limitation on that belief constitutes a substantial burden on the practice of his religion. *See Smith*, 502 F.3d at 1278. Accordingly, we affirm the dismissal of the RLUIPA and TRFRA claims.

V.

McFaul contends that defendants violated his equal protection rights. He claims that inmates in other prison units were allowed to have expensive religious medallions that were not sold in the commissary. And he points to the Satanist who was able to obtain a gold inverted pentagram that cost more than the $25 prison limit. Because those facts, even if true, would not prove discriminatory intent, we affirm the dismissal of the equal protection claim.

To establish a Fourteenth Amendment equal-protection claim, McFaul "must allege and prove that he received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent." *Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001). The Equal Protection Clause does not require "that every religious sect or group within a prison—however few in numbers—must have identical facilities or personnel"; it requires only that prison officials afford inmates "reasonable opportunities . . . to exercise the religious freedom guaranteed by the First and Fourteenth Amendment[s]." *Baranowski*, 486 F.3d at 123 (internal quotation marks and citation omitted).

Even if we assume the truth of McFaul's allegations that a Satanist prisoner was granted an exception to the medallion policy, he has not shown the existence of "a genuine dispute as to any material fact." FED. R. CIV. P. 56(a). He relies on the fact that the Satanist obtained a medallion costing $61.95, the same price as his black onyx pentagram. He asserts that this differential treatment

18

resulted from discriminatory intent, as indicated by Valenzuela's statement that McFaul was going to burn in hell.

The full quotation reflected, however, that Valenzuela believed that "all pagans were going to burn in Hell." McFaul's only evidence of discriminatory treatment involves the provision of a medallion exceeding the price limit to a Satanist, presumably also considered by Valenzuela as a "pagan."[8] McFall provides no evidence that the price-limit rule does not exist or that individuals belonging to standardized religions or Christian denominations were able to obtain religious relics exceeding the price limit.

McFaul's own assertions undercut his argument that he was denied his religious medallions and treated differently from the Satanist based on Valenzuela's animosity to non-Christian or non-mainstream religions. McFaul thus has not established a question of material fact regarding the discriminatory intent required under the Equal Protection Clause. *See Taylor*, 257 F.3d at 473.

McFaul also appears to be arguing that the denial of his medallions constituted retaliation for his filing of grievances. Although the district court did not address such an argument, liberal constructions of McFaul's complaint and statements at the *Spears* hearing reflect that he tried to raise such an allegation. His claim is unavailing.

To state a retaliation claim, "a prisoner must allege (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his or her exercise of that right, (3) a retaliatory adverse act, and (4) causation." *Jones v. Greninger*, 188 F.3d 322, 324-25 (5th Cir. 1999). McFaul relies on the fact that Valenzuela told him that he was going to burn in Hell and that if McFaul continued to file grievances, "he would never get anything." Valenzuela purportedly

___

[8] *See* WEBSTER'S II NEW RIVERSIDE UNIVERSITY DICTIONARY 844 (1984) (defining pagans and individuals who are non-Christian or do not belong to a Christian, Jewish, or Muslim denomination).

made the "hell" statement on June 24, 2009, when he first told McFaul that he was not going to receive his black onyx pentagram medallion and the "grievance" statement when he advised McFaul of the warden's denial of the request on July 2. McFaul asserts that the "hell" statement shows that Valenzuela had already intended to deny the request for the medallion. But given that the price of the medallion provided a valid basis for Valenzuela to withhold it from McFaul, McFaul has not established the requisite intent.[9]

Additionally, prison policies show that the warden rules on whether to allow a prisoner to obtain a nonconforming medallion. McFaul provides no evidence that any of the wardens was aware of Valenzuela's statement, so he has not shown the necessary causation. *See Jones*, 188 F.3d at 324-25. As for the "grievance" statement, McFaul does not allege that he has been deprived of any requested religious items after the statement was made. Therefore, he has not presented an adverse action taken against him for a retaliatory purpose. *Id.*

McFaul also appears to contend that he was denied due process because the defendants failed to follow prison policy for denying requests for religious items. To the extent that he presented such a claim in the district court, he has not shown a genuine dispute of material fact. An assertion that prison officials failed to follow prison rules or policies does not set forth a constitutional claim. *See Jackson v. Cain*, 864 F.2d 1235, 1251-52 (5th Cir. 1989). To the extent that McFaul is alleging a freestanding due-process claim because the prison failed to follow its own procedures for reviewing requests for religious items, "[p]rocess is not an end in itself." *District Attorney's Office for Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2319 (2009). "Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitle-

---

[9] *See McDonald v. Steward*, 132 F.3d 225, 231 (5th Cir. 1998) (finding no evidence of retaliatory intent or causation if a violation of a reasonable prison regulation supported the adverse action).

No. 11-10218

ment." *United States v. Crouch*, 84 F.3d 1497, 1516 (5th Cir. 1996) (internal quotation marks omitted).  Because McFaul has not shown that the defendants violated a constitutionally protected interest, he has not established a due-process violation.  *See Neuwirth v. La. State Bd. of Dentistry*, 845 F.2d 553, 557 (5th Cir. 1988).

## VI.

McFaul argues that the MJ lacked jurisdiction to rule on his motions because the defendants never consented to her jurisdiction.  He maintains that he was prejudiced by the MJ's rulings but that his consent to her authority deprived him of the ability to object to the rulings and that the defendants retained the right to object by failing to give consent.  McFaul's assertioins are meritless.

Parties may consent in writing to having a MJ conduct proceedings and enter final judgment in a civil matter.[10]  Even if the parties do not consent, however, the district court may designate a MJ "to hear and determine any pretrial matter pending before the court" even where a motion for summary judgment is excepted from such rulings.  § 636(b)(1)(A).  An aggrieved party may appeal such a ruling to the district court if the MJ's ruling was legally or factually incorrect.  *Id.*  Moreover, under § 636(b)(1)(B), the court may authorize the MJ "to conduct hearings . . . and to submit to a judge of the court proposed findings of fact and recommendations for the disposition" of motions excepted under § 636-(b)(1)(A).  After such a recommendation, the parties may submit written objections within fourteen days after receiving a copy of the recommendation and may have their objections reviewed *de novo* by the district court.  § 636(b)(1)(C); FED.

---

[10] 28 U.S.C. § 636(c)(1); *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 171-72 (5th Cir. 2011); *Archie v. Christian*, 808 F.2d 1132, 1135 n.3 (5th Cir. 1987) (en banc).

No. 11-10218

R. CIV. P. 72(b).

That procedure was followed here.  Thus, the MJ properly ruled on McFaul's motions and entered a recommendation on the motion for summary judgment despite the defendants' failure to consent to her consideration of the motions.

VII.

McFaul maintains that the district court prejudiced him by granting defendants' request for a discovery protective order.  He contends that any absence of a factual dispute was the result of the limitations on his ability to conduct discovery.  He argues that as a result of the protective order, he was unable to obtain evidence that TDCJ was applying prison policies in a non-neutral manner.  He also asserts that Pierce provided nonresponsive answers to his interrogatories and that the defendant was "supposed to seek the answer to the question if he [does not] know the answer," such as by "call[ing] other Unit Wardens and ask[ing] them what was the most expensive medallion that has been approved for an Offender to have within the last five years, the last two years, and within the last year."

A district court may exercise its "sound discretion" with respect to discovery matters.  *King v. Dogan*, 31 F.3d 344, 346 (5th Cir. 1994) (internal quotation marks and citation omitted).  A party opposing summary judgment "must show how the additional discovery will defeat the summary judgment motion." *Id*.  Although motions to conduct discovery are generally favored and should be liberally granted, *Beattie v. Madison Cnty. Sch. Dist.*, 254 F.3d 595, 606 (5th Cir. 2001), the movant "may not simply rely on vague assertions that additional discovery will produce needed, but unspecified facts," but instead must show why he needs additional discovery and how that discovery will create a genuine issue of material fact, *id*. (internal quotation marks and citation omitted).

22

No. 11-10218

In granting the defendants' request in part, the court did order responses to some discovery requests relating to the value of religious medallions that had been approved. McFaul does not offer any description of the evidence that would have been revealed if the court had permitted him additional discovery, so he cannot meet his burden to show how the discovery would have created a genuine issue of material fact. *Id.*

McFaul further contends that the defendants did not give "proper responses" to the interrogatories that the court ordered answered. The only inadequate response he discusses is one given by Pierce. Because he has not briefed any challenge to the other answers, any such claims are deemed abandoned. *See Brinkmann v. Dall. Cnty. Deputy Sheriff Abner*, 813 F.2d 744, 748 (5th Cir. 1987).

With respect to Pierce's interrogatories, McFaul asked him "[p]lease state the most expensive medallion that has been approved for an offender to have within the last five years, the last two years[,] and within the last year." Pierce replied,

> To my knowledge, the most expensive religious medallion available for sale in the unit commissaries at any time during the last five years has been the Wiccan medallion priced at $25.75. I have been director of Chaplaincy since 2002. In this position, I am not involved in the unit requests for medallions. Additionally, according to policy, medallions over the amount of $25.00 require the warden's approval.

McFaul complains that this is unresponsive and evasive and that Pierce had an obligation to obtain the requested information from TDCJ unit wardens. Courts may not consider the responses to interrogatories that are not within the personal knowledge of the individual answering them.[11] Pierce provided McFaul

---

[11] *See BMG Music v. Martinez*, 74 F.3d 87, 90 n.18 (5th Cir. 1996); *see also* FED. R. CIV. P. 56(c)(4) (stating that affidavits or declarations supporting a motion for summary judgment

(continued...)

No. 11-10218

with the information within his personal knowledge about the pricing of religious medallions. Any information he had obtained from unit wardens would not have been within his personal knowledge and thus would not constitute a proper interrogatory response. Therefore, McFaul has failed to show that the desired answer would have created a genuine dispute of material fact. *See Beattie*, 254 F.3d at 606.

## VIII.

McFaul asserts that the district court erred in denying his motions for appointment of counsel. He maintains that because his adherence to a religion relying solely on an oral tradition for First Amendment protections is an issue of first impression, extraordinary circumstances exist warranting the assistance of an attorney. There is no general right to counsel in civil rights actions. *Cupit v. Jones*, 835 F.2d 82, 86 (5th Cir. 1987). An attorney should be appointed only if exceptional circumstances exist. *Ulmer v. Chancellor*, 691 F.2d 209, 212 (5th Cir. 1982). The factual issues surrounding McFaul's claims are relatively simple. Although he asserts that his case is "extraordinary" because his religion is based on an oral tradition, his claims are not unique or unusual. *See, e.g.*, *Adkins*, 393 F.3d at 567. Because McFaul has not shown exceptional circumstances, the court did not abuse its discretion in denying counsel. *See Jackson v. Dall. Police Dep't*, 811 F.2d 260, 260-61 (5th Cir. 1986).

The summary judgment is AFFIRMED.

---

[11] (...continued) must be based on personal knowledge).

24