# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 6, 2025

Lyle W. Cayce
Clerk

No. 24-60603

Jairus K. Greene,

*Plaintiff—Appellant*,

*versus*

Entergy Operations, Incorporated,

*Defendant—Appellee*.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
USDC No. 5:23-CV-16

_____

Before Wiener, Willett, and Ho, *Circuit Judges*.
Per Curiam:[*]

Jairus Greene challenges his termination from a nuclear power plant operated by Entergy Operations, Inc. The district court granted summary judgment for Entergy. Finding no reversible error, we AFFIRM.

_____

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 24-60603

## I

## A

Entergy operates the Grand Gulf nuclear power plant in Port Gibson, Mississippi. As a nuclear reactor licensee, the facility is subject to Nuclear Regulatory Commission (Commission) regulations, including various restrictions on personnel access. The Commission requires such facilities to "implement drug and alcohol testing programs" to "deter and detect substance abuse." 10 C.F.R. § 26.31(a). To comply, Entergy maintains two internal review frameworks that operate in tandem: unescorted access authorization and a Fitness for Duty (FFD) Program. The Program screens for employees "under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties." 10 C.F.R. § 26.23(b). Employees receive unescorted access privileges only if they submit to routine drug and alcohol testing.

Following drug testing, the Commission requires a Medical Review Officer to "review and interpret positive, adulterated, substituted, invalid, and dilute test results obtained through the licensee's or other entity's testing program and to identify any evidence of subversion of the testing process." 10 C.F.R. § 26.183(c). These Medical Officers must "examine alternate medical explanations for any positive . . . test result," which may involve "conducting a medical interview with the donor," "reviewing the donor's medical history," or "review[ing] all medical records that the donor may make available" to show that the result stemmed from the responsible use of prescribed medication. *Id.* Medical Officers may review only those specimens "collected and processed" in accordance with the Commission's regulations. *Id.*

2

No. 24-60603

The Commission also mandates that "nuclear licensees share certain information about persons who have applied for [unescorted access authorization] after the applicants have signed releases." *See* 10 C.F.R. § 73.56(d)(4)(v). Entergy and other nuclear facilities that participate in the Commission's Personnel Access Data System (PADS) "enter information into . . . a centralized computer database accessible to other licensees across the country." *See* NEI 03-01, § 2(b)–(e)**.** This information includes, among other things, the date an employee's unescorted access authorization is granted, the number of chemical samples collected under the Fitness for Duty Program, and the reasons for those tests. NEI 03-01, § 12.1(c). If a licensee revokes an employee's access, that revocation must also be recorded in the data system.

## B

With this regulatory backdrop, we turn to the facts of the case.

Entergy hired Jairus Greene in 2019 as an Assessor on its Nuclear Independent Oversight team. The team was responsible for "identifying and reporting gaps in compliance . . . so Entergy can address them." As an Assessor, Greene was required to comply with Entergy's Fitness for Duty Program and to maintain his unescorted access authorization.[1]

From September 2019—when he was hired—to May 2021, Greene submitted multiple urine drug tests. The first two tests were negative for marijuana metabolites and other illegal substances. The next seven, however, returned positive results for marijuana metabolites above the 50 ng/mL screening threshold. Still, the Medical Review Officer determined that the test results did not constitute FFD violations because Greene provided

---

[1] Greene signed a consent and release authorizing Entergy to share his unescorted access authorization information on PADS.

documentation for an unexpired prescription of Dronabinol (name brand Marinol), which had been prescribed to treat his glaucoma.

Several months later, in May 2021, Entergy contracted with new Medical Officers—Dr. Monfee and Dr. Barron. In September 2021, Greene consented to a follow-up urine drug test, which returned a positive result. The Officers conferred with Greene and learned that his prescription for Marinol—which "could provide a legitimate medical explanation" for the result—had expired two months earlier, in July. Citing the expired prescription and elevated THC levels, Dr. Monfee declined to excuse the result and ordered additional testing for THCV—a compound present in marijuana but *not* in Marinol. The outsourced lab reported that the sample was "[p]ositive for THCV" and "[could not] be the result of the sole use of Marinol." Based on this result, Dr. Barron deemed the result an FFD violation, "confirmed that no acceptable medical explanation existed," and informed Greene of his right to retest the original sample.

On October 14, 2021, Entergy revoked Greene's unescorted access privileges for two weeks and placed him on unpaid leave. The company also reported this information in PADS. Five days later, Greene requested a retest of the September sample. Dr. Monfee reported that the specimen again tested positive for THCV.

In November, Greene submitted another urine sample. The lab reported a positive result, prompting Dr. Monfee to order follow-up testing for THCV to account for Greene's Marinol use. Although the sample again tested positive for THCV, Dr. Monfee "did not deem it an FFD violation because the 'drop in level suggest[ed] no continued use of THC since last test.'" Meanwhile, Entergy converted Greene's leave status from unpaid to paid and reimbursed him for a portion of his lost wages and vacation time.

No. 24-60603

Greene continued his efforts to regain "unescorted access" status. In January 2022, he submitted another urine sample, which tested positive for marijuana metabolites. Dr. Monfee ordered THCV testing, and the lab reported that "[t]he presence of THCV metabolite in [Greene's] urine indicates prior ingestion of marijuana (or a related product) and cannot be the result of the sole use of Marinol." Dr. Monfee discussed the results with Greene, who denied using anything other than Marinol. Greene produced a renewed prescription for Marinol, but it was dated just one day before he submitted the positive sample. Dr. Monfee "concluded that the January 17 prescription for Marinol could have had no impact on Greene's January 18 specimen, reasoning that . . . Greene had not filled it prior to giving the urine specimen." Greene asserted that he had "stockpiled" the Marinol, but Dr. Monfee rejected that explanation and labeled the January drug test a second FFD violation.

In February 2022, Entergy notified Greene that his unescorted access authorization was permanently revoked due to a second FFD violation and placed him on unpaid leave. Entergy also updated Greene's PADS record to reflect the revocation.

Greene appealed Dr. Monfee's determination. During the appeal process, Greene disclosed that he had used hemp-derived yet "legal" THCV products that he purchased while employed at Entergy. Both MROs stated that Greene had never mentioned using these products when questioned about his test results. Greene's appeal failed, and Entergy terminated his employment in April 2022.

More than a year later, Greene sued Entergy for unlawful and retaliatory discharge, violations of the Americans with Disabilities Act (ADA), malicious interference with contract, defamation, and intentional infliction of emotional distress. Entergy moved for summary judgment in

5

No. 24-60603

January 2024. Greene did not oppose summary judgment on his ADA claim but continued to press his remaining claims. The district court granted summary judgment for Entergy and dismissed all claims with prejudice. Greene timely appealed.

## II

"Under 28 U.S.C. § 1332(a), federal courts have subject matter jurisdiction over a case 'when the amount in controversy is satisfied and there is complete diversity of citizenship between the parties.'" *UniWell Lab'ys L.L.C. v. Frain Indus. Inc.*, No. 24-10204, 2024 WL 4678873, at *1 (5th Cir. Nov. 5, 2024) (per curiam) (quoting *Vantage Drilling Co. v. Hsin-Chi Su*, 741 F.3d 535, 537 (5th Cir. 2014)); 28 U.S.C. § 1332(a). "Complete diversity exists when 'the citizenship of each plaintiff is diverse from the citizenship of each defendant.'" *Id.* (quoting *Caterpillar Inc. v. Lewis*, 519 U.S. 61, 68 (1996)). Greene is a resident of Colorado, while Entergy is a Delaware corporation. And the alleged events giving rise to Greene's suit took place in Mississippi. Accordingly, we have jurisdiction to review the district court's decision.

## III

We review summary judgment de novo. *See Batiste v. Lewis*, 976 F.3d 493, 500 (5th Cir. 2020). Summary judgment is proper only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A fact dispute is "genuine" if "a reasonable jury could return a verdict for [the nonmovant] based on the evidence." *Coleman v. BP Exploration & Prod., Inc.*, 19 F.4th 720, 726 (5th Cir. 2021) (citation omitted). And "we must view all evidence and draw all justifiable inferences in favor of . . . the nonmovant." *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 502 (5th Cir. 2022) (citation and internal quotation marks omitted).

6

Although we "avoid credibility determinations and weighing of the evidence," *Goudeau v. Nat'l Oilwell Varco, L.P.*, 793 F.3d 470, 474 (5th Cir. 2015) (citation and internal quotation marks omitted), "[a] party cannot defeat summary judgment with 'conclus[ory] allegations, unsupported assertions, or presentation of only a scintilla of evidence.'" *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 452 (5th Cir. 2023) (quoting *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)). "Instead, the nonmovant must go beyond the pleadings and designate specific facts that prove that a genuine issue of material fact exists." *Id.* (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). Said another way, we "may grant summary judgment when 'critical evidence is so weak or tenuous on an essential fact that it could not support a judgment in favor of the nonmovant.'" *Ibanez v. Texas A&M Univ. Kingsville*, 118 F.4th 677, 682 (5th Cir. 2024) (quoting *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).

## IV

We begin with Greene's claim of retaliatory and wrongful termination. Because this case falls within our diversity jurisdiction, we look to Mississippi law. *See Krieser v. Hobbs*, 166 F.3d 736, 739 (5th Cir.1999).

### A

"Mississippi adheres to the common law doctrine of employment-at-will." *Senseney v. Mississippi Power Co.*, 914 So. 2d 1225, 1228 (Miss. Ct. App. 2005) (citing *Kelly v. Miss. Valley Gas Co.*, 397 So. 2d 874, 874 (Miss. 1981)). Under this doctrine, "either the employer or the employee may terminate the employment relationship at-will unless the parties are bound by an employment contract or a contract providing for a term of employment." *Id.* (citing *Perry v. Sears, Roebuck & Co.,* 508 So. 2d 1086, 1088 (Miss. 1987)). At-will doctrine also "means that an employer may terminate an employee at

any time for a good reason, a wrong reason, or no reason at all." *Id.* (internal citation omitted).

Even so, the Mississippi Supreme Court has recognized two "narrow public policy exception[s] to the employment at will doctrine":

> (1) an employee who refuses to participate in an illegal act . . . shall not be barred by the common law rule of employment at will from bringing an action in tort for damages against his employer;

> (2) an employee who is discharged for reporting illegal acts of his employer to the employer or anyone else is not barred by the employment at will doctrine from bringing action in tort for damages against his employer.

*McArn v. Allied Bruce-Terminix Co., Inc.*, 626 So. 2d 603, 607 (Miss. 1993).

## B

Greene's case rises or falls on a theory of wrongful termination. To prevail, he must show that Entergy fired him for "refusing to follow [its] directive to do illegal activity or for exposing illegal activity in the workplace." *Senseney*, 914 So. 2d at 1228. We therefore ask whether Greene satisfies either of the *McArn* exceptions. He alleges that Entergy terminated him for refusing to misrepresent information tied to a 2020 internal engineering audit and two internal performance assessments conducted in 2020 and 2021.

Greene cannot satisfy the second *McArn* exception. That exception applies only when an employee is fired "*for reporting* illegal acts" of the employer. *McArn*, 626 So. 2d at 607 (emphasis added). Greene does not allege that he ever reported Entergy's purported misconduct. Indeed, he admits he never called Entergy's anonymous ethics hotline or "wr[o]te

down" any of his concerns.[2] Accordingly, he cannot invoke the second *McArn* exception.

Nor does Greene qualify for the first *McArn* exception. He fails to "demonstrate that the activities that he complained of constituted either criminal activity or a directive that he engage in criminal activity." *Kyle v. Circus Circus Mississippi, Inc.*, 430 F. App'x 247, 252 (5th Cir. 2011). Greene alleges that Entergy "repeatedly pressured [him] and [his] colleagues to falsify reports regarding . . . substantial deficiencies in . . . safety and security," and that it "attempted to persuade [him] to falsify [his] reports." He further alleges that he "refused on several occasions in writing" and later sought an internal transfer "to avoid retaliation." But neither the complaint nor any other filing by Greene identifies a written statement by an Entergy employee attempting to persuade Greene to falsify documents.

To prevail, Greene must show that Keir's statement amounted to an illegal attempt to "falsif[y], conceal[], or cover[] up by any trick, scheme, or device a material fact," or to make a "materially false, fictitious, or fraudulent statement or representation." 18 U.S.C. § 1001 (a). The sole "evidence" Greene offers to support his claim of retaliatory discharge—and the alleged illegality of Entergy's conduct—appears in his declaration. But the declaration consists of unsupported assertions that merely masquerade as facts.[3] For example, Greene claims that in 2020 engineering and security

_____

[2] Greene asserts only that he is "sure" he "explained to Gabriela" that she needed to "[s]tick to [her] guns" and not change her report.

[3] Greene avers that his recommendations to Manager Piotr Slazar were "rebuffed unprofessionally," and he was "ridiculed" in an email to Manager Jason Keir. Yet he fails to provide the email, a record of the words exchanged, or the date of the communication. Nor does he connect the alleged "rebuffing" to any unlawful conduct by Entergy. Greene also alleges Manager Bob Franssen "instructed Jason Keir to 'get [Greene] off site.'" But again, Greene offers no copy of the email, no record of the exchange, no date, and no link between the manager's alleged animus and any illegal activity. As a final example, Greene

audits, he rated certain plant functions "unsatisfactory." He further stated "that staffing levels, attrition, housekeeping, Work Management prioritization, and Work Management backlogs were unsatisfactory and the root cause of poor Engineering Department performance." According to Greene, Jason Keir (a member of executive management) encouraged him to attribute the plant's shortcomings to engineering "leadership" instead. Yet he offers no documentation suggesting that this exchange ever occurred.

Additionally, Greene flags potentially questionable conduct by Entergy staff members, but never connects it to actual illegality. The same problem recurs when Greene alleges that Keir directed him to "revise [a] report to reflect a more positive narrative of [plant] employment." Greene supplies no date, time, or record of that exchange—and he again fails to tie Keir's statement to any concealment, deception, or fraudulent misrepresentation by Entergy. Greene's declaration lacks the specificity needed to create a genuine dispute of material fact as to whether Entergy directed him to break the law.

Even when the evidence is viewed in the light most favorable to Greene, the record shows only that Entergy terminated him based on its determination that he twice failed a drug test. Greene offers various unsubstantiated claims alleging that Entergy, the MROs, and the laboratories tampered with his urine specimens—but he provides no actual

---

claims on October 14, 2021, FFD personnel told Greene that site management "directed [them] to treat Plaintiff's urinalysis differently." Yet he fails to identify the speaker or cite the "recorded" conversation he claims was "submitted to [Commission] special agents in 2022." Greene further asserts that he "wrote an email . . . to Bob Franssen, Jason Keir, Alfred Cayai, and Admiral David Hahn to acknowledge that [he] was aware . . . management want[ed] him out of the nuclear site"—but he neither cites the email nor submits it into the record.

evidence of any such collusion.[4] His evidence of retaliatory discharge "is so weak or tenuous . . . that it could not support a judgment in favor of the nonmovant." *Armstrong*, 997 F.2d at 67. At most, Greene presents conclusory allegations and unsupported assertions—neither of which can defeat summary judgment.

## V

Next, we consider Greene's claims for defamation and malicious interference. Neither claim survives summary judgment.

Under Mississippi law, a plaintiff alleging defamation must show "(1) a false and defamatory statement was made concerning the plaintiff; (2) there was an unprivileged publication to a third party; (3) the publisher was negligent in publishing the defamatory statement; (4) the plaintiff suffered damages resulting from publication of the defamatory statement." *Gales v.*

---------------------------------

[4] In his declaration, Greene offers only two specific pieces of information to support this allegation of collusion: (1) that he emailed executive managers on October 14, 2021, expressing concern that his FFD evidence would be tampered with; and (2) that Dr. Barron called him on the same day. But even these assertions lack any record support—there are no email copies, phone logs, direct quotes, or other evidence to substantiate that these interactions occurred. The remaining "facts" are either too vague—such as allegations pegged only to a calendar year—or conclusory, as in Greene's claim that "Dr. Barron . . . already had determined that I had failed."

Greene's opposition to Entergy's motion for summary judgment includes images of his signature on two different forms—one he claims he signed, and another he claims he did not. He also submits photographs of various labels, which he says prove Entergy inserted a fake sample as part of a "scheme to take down [Greene]." But Greene's narrative is disjointed, and such serious allegations demand actual evidence, not conjecture. As we have repeatedly emphasized, "[a] non-movant will not avoid summary judgment by presenting 'speculation, improbable inferences, or unsubstantiated assertions.'" *Lawrence v. Fed. Home Loan Mortg. Corp.*, 808 F.3d 670, 673 (5th Cir. 2015) (quoting *Likens v. Hartford Life & Accident Ins. Co.*, 688 F.3d 197, 202 (5th Cir. 2012)). Greene's filings contain speculation in abundance but evidence in short supply.

No. 24-60603

*CBS Broad., Inc.*, 269 F. Supp. 2d 772, 777 (S.D. Miss. 2003), *aff'd*, 124 F. App'x 275 (5th Cir. 2005).

As noted above, Greene fails to show that the information Entergy uploaded to PADS—factual records of his positive drug test results—was false. We will not penalize Entergy for conduct mandated by federal regulation. The Commission requires licensees like Entergy to report when an employee's unescorted access authorization is terminated, whether the termination was unfavorable, and whether additional relevant information is held by the licensee.[5] NEI 03-01, § 12.1(e). Moreover, Greene consented to the disclosure of his information in the PADS system when he sought unescorted access authorization at Entergy's plant. Specifically, he "authorize[d] the entry into the PADS computer database of any information collected for the . . . continued maintenance of [unescorted access authorization], access to a nuclear power plant," as well as "the transfer of such information . . . to other [Commission] nuclear facility licensees and contractors/vendors."

This waiver likewise defeats Greene's malicious interference claim. In signing the PADS Consent Form, Greene "release[d] Entergy . . . from any and all liability based on their authorized receipt, disclosure, or use of the information obtained pursuant to th[e] Consent." Greene has never challenged the validity of that waiver, and the document unambiguously shields Entergy from liability for uploading his drug test results to PADS. *See Gerhart v. Exelon Corp.*, 461 F. App'x 143, 145–46 (3d Cir. 2012) (holding that an employee waived a tortious-interference claim by signing a PADS

---

[5] NEI 03-01, § 12.1(c) requires licensees report the "date of FFD chemical sample collected and reason for test" as well as any "follow-up information . . ., estimated end date frequency of testing, and number of tests required."

Consent Form). Because Greene fails to articulate any legal basis for avoiding the Consent Form's waiver, summary judgment was proper.

## VI

Finally, we address Greene's claim for intentional infliction of emotional distress. It, too, fails.

"Meeting the requisite elements of a claim for intentional infliction of emotional distress is a tall order in Mississippi." *Jenkins v. City of Grenada*, 813 F. Supp. 443, 446 (N.D. Miss. 1993). "To justify a finding that this tort has occurred, the defendant's conduct must be 'wanton and [willful] and it would evoke outrage or revulsion.'" *Speed v. Scott*, 787 So. 2d 626, 630 (Miss. 2001) (quoting *Leaf River Forest Prods., Inc. v. Ferguson*, 662 So. 2d 648, 659 (Miss. 1995)). Accordingly, "[a] claim for intentional infliction of emotional distress will not ordinarily lie for mere employment disputes." *Pegues v. Emerson Elec. Co.*, 913 F. Supp. 976, 982 (N.D. Miss. 1996).

Having already affirmed summary judgment for Entergy on Greene's claims for malicious interference and defamation, we do the same for his emotional-distress claim. Greene has not shown that Entergy acted "wanton[ly]" in revoking his unescorted access privileges or reporting his positive drug test results in PADS. While fabricating a test result and orchestrating a termination would no doubt be "outrage[ous]" or "rev[olting]," Greene offers no competent evidence that such a scheme occurred.

## VII

For these reasons, we AFFIRM summary judgment for Entergy.